**COLLEEN FLYNN**, CSB 234281
ATTORNEY AT LAW
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA  90010
(213) 252-9444 / (213) 252-0091 facsimile
E-mail: cflynnlaw@yahoo.com

**DONALD W. COOK**, CSB 116666
ATTORNEY AT LAW
3435 Wilshire Blvd., Ste. 2910
Los Angeles, CA 90010
(213) 252-9444 / (213) 252-0091 facsimile
Email: manncooklaw@gmail.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIANNA LACOSTE, an individual, | Case No. 2:23-cv-4917 |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| vs. | 1. Unreasonable Seizure / 4th Amendment / 42 U.S.C. § 1983 |
| COUNTY OF LOS ANGELES, a municipal corporation; LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, a public entity;   ALEX VILLANUEVA, DEPUTY SHERIFFS NATHAN DEBOOM (#606645), AARON ESCOBEDO (#621443), JOSE HURTADO (#552712), MIKAH LOPEZ (#652884); CHARLES L. McDANIEL; JUAN MEZA (#484495), MICHAEL MILESKI (#424383), RAMON MUNOZ (#499029), ROVERT OKAMOTO (#511813); JOSE RAMIREZ (#503608), MARK REYES (#528504), ADRIAN RUIZ (#519554), SPENCER ZAGURSKI (#550493), and Does 1 through 10, all sued in their individual capacities, | 2. Property Deprivation / 4th & 14th Amendments / 42 U.S.C. § 1983 |
| | 3. Takings Claim / 5th Amendment / 42 U.S.C. § 1983 |
| | 4. 1st Amendment / 42 U.S.C. § 1983 |
| | 5. Privacy Protection Act of 1980 (42 U.S.C. § 2000aa) |
| | 6. Cal. Civ. Code § 52.1 / Cal. Const., Art. I, §§ 2, 3, 7, 13 |
| Defendants. | 7. Cal. Pen. Code § 853.6 / 14th Amendment / 42 U.S.C. § 1983 |
| | 8. Cal. Pen. Code § 851.6 |
| | <u>DEMAND FOR JURY TRIAL</u> |

-1-

**I. JURISDICTION AND VENUE.**

1. Plaintiff's claims arise under 42 U.S.C. §1983. Accordingly, federal jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

2. Plaintiff's claims arise out of, *inter alia*, acts of personnel employed by the County of Los Angeles, causing injury to Plaintiff  in the County of Los Angeles. Accordingly, venue is proper within the Central District of California.

**II. PARTIES.**

3. Plaintiff Julianna Lacoste, an individual, is an independent photographer accredited by the National Press Photographer Association, and is and was at all times relevant hereto, a resident of the County of Los Angeles, City of Los Angeles.

4. At all times material herein, defendant County of Los Angeles ("LA County") was and is a public entity duly organized under the laws of the State of California, and was responsible for the hiring, training, and supervising of the conduct of its employees and agents of the County, the Los Angeles County Sheriff's Department and its deputies and members.

5. At all times material herein, defendant Los Angeles County Sheriff's Department ("LASD"), is a public entity subject to suit under 42 U.S.C. § 1983 (*Streit v. County of Los Angeles*, 236 F.3d 552, 565-66 (9th Cir. 2001)).

6. Plaintiff names the LASD as a separate defendant for two reasons. First, Plaintiff is informed and believes and based thereon allege that former LA County Sheriff Alex Villanueva may claim he was *not* a policymaker for defendant LA County. However, Plaintiff is further informed and believes and based thereon alleges that should Villanueva make that claim, he will nevertheless admit he *was* the policymaker with respect to his own department when he was sheriff, defendant LASD. Thus, Villanueva's self-admitted status as a policymaker for defendant LASD will make that defendant subject to liability should it be determined that Villanueva was responsible for policies that violated the constitutional rights of Plaintiff.

7. Second, there is disagreement between the Ninth Circuit and the California

Supreme Court on whether a California sheriff is a state or county policymaker for § 1983 purposes. In *Brewster v. Shasta County*, 275 F.2d 803 (9th Cir. 2001), and *Streit v. County of Los Angeles*, 236 F.3d 552, 559 (9th Cir. 2001), the Ninth Circuit held that California sheriffs are agents of their employing county for § 1983 purposes. The California Supreme Court, in *Venegas v. County of Los Angeles*, 32 Cal.4th 820, 828-39 (2004), disagreed with the Ninth Circuit, holding instead that a California sheriff is not an agent of his employing county for purposes of § 1983 liability. Should it ultimately be determined that *Venegas* correctly states the law on this point, Plaintiff is informed and believes that Villanueva will nevertheless remain a policymaker for his own department, defendant LASD, while he was Sheriff. Since defendant LASD is *not* an arm of the state for purposes of immunity under the Eleventh Amendment (see *Streit*, 236 F.3d at 556-57), Plaintiff can still prevail against Villanueva in his official capacity and defendant LASD notwithstanding *Venegas*.

8. Defendants LA County and LASD are "persons" subject to suit within the meaning of Title 42, U.S.C. § 1983 under *Monell v. New York Dept. of Social Serv.*, 436 U.S. 658, 691 (1978). Collectively, these two defendants are referred to as "Entity defendants."

9. Defendant Alex Villanueva ("Villanueva"), an individual, at all times material hereto was the LA County Sheriff. Plaintiff is informed and believes and based therein alleges that Villanueva was a policy maker for both defendants LA County *and* LASD. Plaintiff sues Villanueva in his individual and official capacities.

10. At all times material herein, Entity defendants were responsible for the employment, training, and supervision of the actions, conduct, policies, practices, and customs of the employees and agents of the LA County, including LASD and all of its deputies and members. At all times material herein, Entity defendants were responsible for assuring that the actions, conduct, policies, procedures, and customs of the LASD complied with the laws and the Constitutions of the United States and of the State of California.

11. Plaintiff is informed and believes and based thereon alleges that Nathan Deboom (#606645), Aaron Escobedo (#621443), Jose Hurtado (#552712), Mikah Lopez (#652884), Charles L. McDaniel (the LASD refuses to provide his employee number), Juan Meza (#484495), Michael Mileski (#424383), Ramon Munoz (#499029), Rovert Okamoto (#511813), Jose Ramirez (#503608), Mark Reyes (#528504), Adrian Ruiz (#519554) and Spencer Zagurski (#550493) are all individuals and were, at all times relevant hereto, LASD deputies. These individual deputy sheriffs are sued in their individual capacities. Collectively, these defendants are referred to hereinafter as "Deputy defendants."

12. Although Plaintiff does not believe that each and every Deputy defendant committed all the wrongful acts of which she complains, Plaintiff must nevertheless name and sue *all* Deputy defendants because, contrary to LASD formal *written* policy but in accordance with an established and *de facto* LASD practice approved by LASD supervisors and policy makers, in documenting the events of September 8, 2020 LASD personnel did not identify which deputy(ies) used force against Plaintiff and which deputy(ies) actually arrested her. Thus, based on available information in her counsel's possession, Plaintiff must name and sue each and every Deputy defendant as possibly responsible for the wrongful acts about which Plaintiff sues.

13. The true names of defendants DOES 1 through 10, inclusive, are not now known to Plaintiff who therefore sues these Defendants by fictitious names. Upon ascertaining the true name of a DOE Defendant, Plaintiff will amend this complaint, or seek leave to do so, by substituting same for the fictitious name. Plaintiff is informed and believes, and based thereon alleges, that each DOE Defendant is in some manner responsible for the injuries and damages herein complained of.

14. At all times material herein, defendants were each acting as the employee, agent representative, and officer of every other defendant herein, and within the course and scope of such employment and agency. All defendants were acting under color of state law.

00156291.WPD

*Tolling*

15. On October 21, 2020, plaintiffs in *Berg et al. v. County of Los Angeles et al.*, U.S.D.C. no. 2:20-cv-7870 DMG, filed their first amended complaint ("*Berg* FAC"). *Berg* was and is a putative class action lawsuit. In the *Berg* FAC, the F.R.Cv.P. 23(b)(3) damages classes are defined to include persons like Plaintiff Ms. Lacoste who attended 2020 protests against police violence such as the September 8, 2020 South LA protest, protests at which LASD deputies falsely arrested persons on fabricated charges such as Cal. Pen. Code § 409, and used less-lethal excessive force against persons like Plaintiff. Under the *Berg* FAC's second, third and fourth causes, Plaintiff Ms. Lacoste is an unnamed class member of the damages classes.

16. On July 30, 2021, the *Berg* plaintiffs filed their second amended complaint ("*Berg* SAC"). As with the *Berg* FAC, the *Berg* SAC alleges F.R.Cv.P. 23(b)(3) damages classes under federal and state law (second, third and fourth causes of action). The classes include persons arrested and injured the September 8, 2020 protest like Plaintiff Ms. Lacoste; hence, Plaintiff Ms. Lacoste is an unnamed class member of the damages classes alleged in the *Berg* SAC's second, third and fourth causes.

17. As of this writing, the *Berg* Court has not yet made a ruling on class certification. Hence, the statute of limitations on Plaintiff's federal and state law claims have been tolled from at least October 21, 2020 (filing date of the *Berg* FAC) through the present. *Agritech, Inc. v. Resh*, ___ U.S. ___, 138 S.Ct. 1800, 1804 (2018) ("[T]he timely filing of a class action tolls the applicable statute of limitations for all persons encompassed by the class complaint.").

18. Plaintiff Ms. Lacoste also has tolling based on the damages class claims asserted in *Astorga et al v. County of Los Angeles, et al.*, U.S.D.C. no. 2:20-cv-9805 AB. *Astorga* first amended complaint (ECF 9 filed 10/29/20), ¶¶65-71, and Count Three; *Astorga* second amended complaint (ECF 105 filed 5/24/21), ¶¶72-78, and counts six and seven). That tolling ended October 21, 2021, when the *Astorga* Court made a final ruling denying class certification (ECF 179 filed 10/21/21 in *Astorga*). Therefore, the instant

action is also timely based on the *Astorga* tolling. *Agritech*, *supra*.

**III. FACTS COMMON TO ALL CLAIMS.**

19. This is a civil rights action challenging the LASD's violent arrest, injuring and jailing of a photographer, the breaking and seizure of her camera, and the "loss" of her smart phone (which she was using to live-stream the LASD's response to a public demonstration when she was arrested), in violation of her First Amendment right to film and photograph deputy activities in public places, particularly during protests against police violence.

20. The First Amendment right to film law enforcement in pubic benefits the public by providing them visual information on law enforcement practices. The Ninth Circuit and other Circuits have recognized the First Amendment right to film matters of public interest such as the behavior of law enforcement during public demonstrations. *Fordyce v. City of Seattle,* 55 F.3d 436, 439 (9th Cir. 1995); *Glik v. Cunniffe,* 655 F.3d 78, 82 (1st Cir. 2011) ("Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of government affairs,' " *quoting Mills v. Alabama,* 384 U.S. 214, 218 (1966)). There is no qualified immunity for officers who arrest journalists peacefully filming law enforcement in public.

21. The U.S. Department of Justice has also recognized the First Amendment right to record deputies in public is "consistent with our fundamental notions of liberty, promote[s] the accountability of our government officers, and instill[s] public confidence in the police officers who serve us daily." STATEMENT OF INTEREST OF THE UNITED STATES AT 1, *Sharp v. Baltimore City Police Dep't,* No. 11 Civ. 2888 (D. Md. Jan 10, 2012), ECF No. 24.

22. Notwithstanding this clearly established First Amendment right, one or more Deputy defendants arrested Plaintiff--a credentialed photographer--without probable cause. Plaintiff was in the process of lawfully and peacefully gathering news by filming police activity from a public street and sidewalk. One or more Deputy defendants

00156291.WPD

nevertheless shot Plaintiff with so-called less-lethal weapons and brutalized Plaintiff despite her clearly displaying her credentials and professional 35mm single lens reflex camera.

23. The unlawful force used against Plaintiff and her arrest on September 8 was not an isolated event. On September 8 the LASD also arrested live-streamer journalist Hugo Padilla and student journalist Pablo Unzueta. Padilla, wearing a helmet that said "PRESS," was live-streaming the event to followers on his YouTube channel while riding his bicycle when deputies shot him with less lethal munitions, knocking him off his bicycle, punched him in the face, and arrested him. Unzueta, a credentialed student journalist, was a video editor, reporter, and photojournalist for California State University, Long Beach's *Daily Forty-Niner* newspaper, as well as a freelance photojournalist who has had his work published in the *Washington Post, Harper's Magazine and* Cal Matters. Unzueta displayed his press credentials and offered to call his supervisor to confirm his identity as a student journalist, yet the deputies still arrested him.

24. The LASD has demonstrated a longstanding custom, pattern, and practice of unlawfully interfering with the recording of police activity conducted in public view. Just a week later, on September 14, 2020, LASD deputies threw KPCC reporter Josie Huang to the ground as she was peacefully covering a small protest and arrested her, ignoring her cries that she was a reporter. Then-District Attorney Jackie Lacy refused to press charges. This custom, pattern, and practice is the result of a lack of adequate training regarding the First Amendment right of the press and the public to record police activities in public, a failure to supervise and discipline deputies who retaliate or interfere with this right, and the deliberate indifference by LASD supervising personnel to a culture of disregard for the constitutional right to record police activity in public.

25. Defendants violated Plaintiff's clearly established rights under the First Amendment to the United States Constitution by arresting her for exercising her First Amendment right to film and report about deputies performing their official duties in

public. Defendants also violated Plaintiff's clearly established rights under the Fourth Amendment to the United States Constitution to be free from excessive force, and free from arrest and seizure of her property without probable cause.

26. Defendants violated Plaintiff's rights under the Fifth Amendment to the United States Constitution by seizing her camera, refusing to immediately return it, and by taking her smart phone and throwing it in the street instead of booking it as the LASD station as Plaintiff's property.

27. Defendants violated the Bane Act (Cal. Civ. Code § 52.1) by subjecting Plaintiff to physical and verbal abuse aimed at intimidating and retaliating against Plaintiff for exercising her constitutional rights under the First, Fourth, and Fifth Amendments.

28. Plaintiff seeks compensatory and punitive damages for Defendants' unlawful actions and the violation of her constitutional rights.

**September 8, 2020 "Justice for Dijon Kizzee" Protest**

29. Plaintiff is a commercial photographer and graphic designer who documents protests against police violence in 2020 as an independent photographer accredited by the National Press Photographers Association ("NPPA") (www.nppa.org).

30. Plaintiff is informed and believes and based thereon alleges that as a result of police uses of force causing the deaths of individuals under circumstances demonstrating that officers may be guilty of unjustified homicides in 2020, incidents that occurred locally (e.g., June 18, 2020 LASD shooting death of Andres Guardado; August 31, 2020 LASD shooting death of Dijon Kizzee) and across the nation (e.g., March 13, 2020 shooting death of Breonna Taylor by Louisville officers; May 25, 2020 death of George Floyd while restrained by Minneapolis police officers) there were numerous protests and demonstrations in the County of Los Angeles. Plaintiff photographed and filmed various of these protests.

31. On September 5, 6, 7, and 8, 2020, demonstrations took place near at and/or near Imperial Highway and Normandie Avenue to protest the killing of Dijon Kizzee by

LASD deputies. LASD deputies responded violently to these demonstrations shooting a variety of less-lethal weapons at protesters including flash-bang grenades, pepper balls, and large rubber-coated bullets. Plaintiff photographed and filmed the September 5, 6, and 8 protests.

32. Plaintiff drove to the September 8 protest alone and parked on a neighborhood side street a few blocks east of Normandie Ave. and off of Imperial Hwy. She arrived about 7:30 p.m. The LASD had shut down the west-bound lanes of Imperial Hwy east of Normandie Ave. Deputies were in the street, on foot and on top of a large truck, dressed in riot gear, holding large, less-lethal weapons. They were facing a small, peaceful protest of about 50 to 75 people who were gathered on Imperial Hwy just east of the intersection with Normandie. Between themselves and the protesters, the deputies had stretched a large metal coil barricade across Imperial Hwy. A loud LASD helicopter was flying overhead.

33. Having previously seen LASD shoot less-lethal weapons at press and protesters at prior protests, for safety reasons on September 8 Plaintiff wore a helmet. In this regard Plaintiff was not alone. Many protesters and journalists wore helmets and other protective gear on September 8 in an effort to avoid serious injury if shot by deputies.

34. Plaintiff also wore a badge issued to her by the NPPA which had her photograph, name, and date of birth clearly displayed along with the NPPA logo.

35. Plaintiff, with a long strawberry-blond ponytail, black helmet, black tank top and blue pants, can been seen in this YouTube video, calmly taking photographs of the deputies with her single lens reflex camera and video with her phone. https://www.youtube.com/watch?v=t3iFkuOWpYY (beginning at the 6 minute 35 second mark Plaintiff is seen walking towards the camera). This video was taken by Hugo Padilla, a plaintiff in *Astorga v. County of Los Angeles*, Case No. 2:20-cv-9805 AB. (The end of the video also captures the deputies shooting Mr. Padilla off his bicycle and arresting him near where Plaintiff was shot and arrested on W. 110th Street.)

36. The deputies moved forward and the protesters moved backwards, into the

00156291.WPD

intersection of Imperial and Normandie.

37. The deputies were making announcements for the crowd to disperse but Plaintiff did not make them out clearly over the noise of the protesters, the helicopter, and the traffic, as the LASD did not close the Southbound lanes of Normandie Ave. north of Imperial. However, within minutes of the LASD's order, deputies, including Defendant deputies, on foot or in vehicles began moving towards the protesters, rounding the corner from Imperial heading north on Normandie. The protesters complied, calmly moving back and away from the deputies.

38. Plaintiff was near the front of the group so that she could document what was happening. She took photographs and was using her smart phone to live-stream the event in real time for people watching on Instragram.

39. Without warning the line of deputies, which Plaintiff is informed and believes and based thereon alleges included the Defendant deputies, then forcefully ran towards the protesters, firing weapons including tear gas munitions, and some that were exploding near Plaintiff. Like others, Plaintiff became frightened, turned and ran as fast as she could away from the shooting deputies, moving north on Normandie Ave.

40. After running for some time, Plaintiff stopped to look around. Her face felt like it was on fire from the tear gas the deputies had shot. She perceived things were calming down as she did not see any deputies but did observe people leaving, going to their cars. She turned east on 110th Street, to return to her vehicle. Plaintiff was now almost half a mile away from the intersection of Normandie and Imperial Highway where the dispersal order was given.

### Excessive Use of Force Against Plaintiff

41. On 110th Street, about a half-block east from Normandie Ave., Plaintiff saw a group of people running frantically towards her, but Plaintiff did not know why they were running. She saw the group turn off the street and run down a driveway. Within moments, without any warning a deputy whom Plaintiff believes was one of the Deputy defendants or a DOE, shot her with a so-called less-lethal munition in her right hand,

00156291.WPD

causing intense pain. She dropped her cell phone she had been holding in that hand. When she dropped the phone, it was live-streaming.

42. One of the Deputy defendants or a DOE then shot Plaintiff directly in the side of the head, snapping her helmet off of her head. One of the Deputy defendants or a DOE also shot her in the shoulder as she tried to find a safe location.

43. Plaintiff ran behind a car and put her hands up. One of the Deputy defendants or a DOE came around the car and put a gun in Plantiff's face prompting Plaintiff to plea "don't shoot, don't shoot!"

### Illegal Arrest of Plaintiff

44. One of the Deputy defendants or a DOE whom Plaintiff believes was a male, came up behind Plaintiff and grabbed her by her ponytail and her waist and slammed her face down onto the ground with such force that her camera which was around her neck broke under her. Then he put his knee on her back and her neck. She yelled, "I'm not resisting." Even though her wrist was injured, swollen and bleeding, one or more Deputy defendants or a DOE handcuffed Plaintiff with metal handcuffs tightly locked on her wrists, causing excruciating pain.

45. One of the Deputy defendants or a DOE whom Plaintiff believes was a male, kept his knee on Plaintiff's neck and she tried to tell him that she couldn't breath. The deputy roughly yanked her up off the ground and shoved her into the back of an LASD pick up truck which the deputies were packing with protesters.

46. Plaintiff was arrested near 1234 W. 110th Street, close to where both Hugo Padilla and Christina Astorga, plaintiff s in *Astorga v. County of Los Angeles*, Case No. 2:20-cv-9805 AB, were shot by one or more Deputy defendants and/or DOES with less-lethal weapons and arrested.

47. Plaintiff, in the back of the LASD truck, felt a warm sensation on her back and realized it was blood oozing from her injured hand. She begged the deputies to loosen the cuffs but they refused. Plaintiff started to have a panic attack. She was in shock, trying to comprehend what was happening.

00156291.WPD

48. As confirmed by the live stream video from Plaintiff's smart phone (the phone continued to live stream even though it had fallen to the ground), a deputy picked up Plaintiff's smart phone and carried it for a bit.  When the deputy realized the phone was recording, he dropped it on the ground and left it there instead of taking it to the station and booking it with Plaintiff's other property.

### Illegal Jailing of Plaintiff

49. Plaintiff was arrested and jailed for almost nineteen hours for the alleged non-violent offense of failing to disperse in response to the LASD's declaration of an unlawful assembly in violation of Cal. Pen. Code § 409. Rather than issuing Plaintiff and the others citations and releasing them in the field as is ordinarily required under state law and LASD policy, one or more Deputy defendants or DOES moved Plaintiff and the others into a van and transported them to the LASD South LA station on Imperial Hwy.

50. At the LASD station on Imperial Hwy, Plaintiff was lined up against an outside wall with other arrestees. Instead of uncuffing Plaintiff and helping her take off her backpack, a deputy cut the backpack off of her with a knife. The deputies allowed a Fox News reporter to take photos of Plaintiff and other arrestees and one or more Deputy defendant or DOES used their personal cell phones to take photos of Plaintiff and other arrestees. Visible in the Fox news footage is a table where Plaintiff saw LASD personnel collecting everyone's property. It appeared to Plaintiff that LASD personnel were not making any attempt to separate the property by individual property owner.

51. Once inside the station Plaintiff was put in a cell, but, because her hand was bleeding so much, the deputies next locked her inside a bathroom.

52. It felt like a long time went by before the deputies took her out of the bathroom to book her, including taking her mugshot (Booking No. 6008226). The booking deputy tried to fingerprint her but her hand was so bloody the deputies decided to take her to the jail hospital at County-USC Medical Center.

53. The deputies who transported her to the hospital tried to scare Plaintiff, telling her, "you're going to die in here," "you're not going to get out of here." Plaintiff, afraid,

00156291.WPD

asked the attending jail nurse not to leave her alone with them.

54. The transport deputies eventually took her back to the LASD station on Imperial Hwy. The next morning at about 10 a.m. they told her they needed to transport her to the County jail.

55. Plaintiff was very injured from being shot in the hand, head, and shoulder, having tight handcuffs on her injured hand, having been slammed onto the ground and a knee pressed into her neck and back, and now beginning to get sick.

56. The County jail facility would not admit her because she had a fever and because the hospital had not properly documented her injuries, including those to her neck and shoulder, and told the deputies to take Plaintiff back to the hospital. The deputies appeared to become angry when told to take Plaintiff back to the hospital. The deputies told her she would not get out of jail for days and refused to take her to the hospital. Instead, the deputies took her back to the LASD station on Imperial Hwy. It was now the afternoon of the day after she had been arrested. All the other arrestees from the night before had been released. She was the only one there. At one point Deputy Luna opened her cell door, telling Plaintiff in a menacing and threatening voice, "You're the last one here [and] no one knows you're here," before slamming the door shut.

57. Plaintiff was cold, sick, bloody and bruised. Instead of getting her medical treatment, the deputies verbally abused her, saying things like, "you're ugly, you look hideous right now." When Plaintiff said it was because deputies had beaten her up, deputies responded coldly with, "At least you didn't get killed."

58. The LASD refused to release Plaintiff on her own recognizance, setting bail for her release at $5,000. Plaintiff was bailed out and, at about 4:30 p.m. on September 9, about 19 hours after being shot and arrested, the LASD released her.

59. Plaintiff's bond paperwork states the charge against her as a violation of Penal Code § 409 – failure to disperse.  However, there was no probable cause to arrest a photographer walking six blocks away from an already dispersed protest.

60. Jailing Plaintiff overnight and requiring the payment of bail for her release

00156291.WPD

violated Cal. Pen. Code § 853.6, which required Plaintiff's release on her own recognizance in the field or immediately after booking. There was no reason why Defendants could not process Plaintiff in the field and release her without prolonged handcuffing.

61. The jailing of Plaintiff also violated the LASD *Manual of Policy and Procedures,* Line Procedures, Prisoners, 5-03/115.05 -- Field Release of Misdemeanor Prisoners, which provides that "[m]isdemeanor prisoners shall be released in the field whenever it is reasonable to do so," provided the arrestee is not intoxicated or charged with a violent offense. *See* https://pars.lasd.org/Viewer/Manuals/11719 /Content/11787?showHistorical=True. But this provision was ignored by numerous LASD supervisors, including various high ranking supervisors.

62. Plaintiff's court appearance date was January 6, 2021. Counsel appeared for Plaintiff on January 6 but no criminal charges were filed. The District Attorney rejected the LASD's request to file a criminal complaint against Plaintiff. No criminal charges were ever filed against Plaintiff because there was no legal basis to do so.

63. On June 8, 2020, Los Angeles County District Attorney Jackie Lacey issued a written "news release" announcing that she would not charge anyone arrested for failure to disperse during anti-police brutality protests that took place in Los Angeles in 2020. The release stated: "Los Angeles District Attorney Jackie Lacey announced today that she will not file charges against any protester for [...] failure to disperse. [...] 'I believe wholeheartedly in free speech and support the right of protesters to demonstrate peacefully against historic racial injustice in our criminal justice system and throughout our nation.' "

64. Aware that the Los Angeles County District Attorney would not charge anyone arrested for failure to disperse during the September 8 anti-police brutality protest, deputies arrested Plaintiff for no other reason than to harass and intimidate her, and to punish her for exercising her First Amendment right to photograph the police in public.
///

00156291.WPD

***Illegal Seizure and Search of Plaintiff's Camera***

65. When Plaintiff was released from jail, the deputies only gave her back her car keys and her press badge. She asked for her camera but a deputy said the LASD was keeping it as evidence.

66. On September 9, 2020, the LASD obtained a warrant to search arrestees' smart phones. The affiant's statement of "probable cause" claimed – falsely -- that Plaintiff had "abandoned" her camera at the location of the purportedly unlawful assembly.

67. The LASD did not obtain a warrant or judicial review of any kind to justify the search and long-term seizure of Plaintiff's camera.

68. The LASD did not return Plaintiff's camera to her for six months, until April 2021.

***Failure of Defendant LASD to Issue a Certificate of Detention***

69. Plaintiff was provided with a notice to appear in court her for her alleged violation of Cal. Pen. Code § 409. When Plaintiff's attorney went to court on the date and time required, she was informed that no charges had been filed against her.

70. Even though Plaintiff was never charged with a crime, Defendant LASD never sent her a Certificate of Detention as required by Cal. Pen. Code § 851.6(b). The statute requires a law enforcement agency to (1) issue a Certificate of Detention to anyone who has been arrested and released for an alleged misdemeanor and not charged and (2) change all references in law enforcement databases to state that the person was detained and not arrested.

***Plaintiff's Arrest and Seizure of Her Property, Was Condoned And/Or Ratified by Policy Makers for Defendants LA County and LASD.***

71. Plaintiff is informed and believes and based thereon alleges that both before and after September 8, 2020, one or more policy makers for LA County and/or LASD, including defendant Villanueva, decided that LASD personnel could and should arrest individuals present at demonstrations that LASD had declared unlawful, without regard to evidence showing that the individuals had failed to disperse or had committed unlawful

acts that justify arrest. In other words, the policy makers decided that mere presence at or near a demonstration declared unlawful, could and would justify an arrest.

72. Plaintiff is informed and believes and based thereon alleges that both before and after September 8, 2020, one or more policy makers for LA County and/or LASD, including defendant Villanueva, also decided that for persons as described above, those persons could and should be subjected to serious injuring force like that directed against Plaintiff without any warning, even though (a) the person had not committed a crime, (b) was not fleeing, and (c) was not threatening harm to anyone.

73. Plaintiff is further informed and believes and based thereon alleges that both before and after September 8, 2020 and continuing up through the present, one or more policy makers for LA County and/or LASD, including defendant Villanueva, decided that for persons arrested as described above, the LASD should take and withhold persons' personal property -- particularly electronic storage devices like smart phones and cameras -- and *not* release or return the property to the owners upon their release from custody. Plaintiff is informed and believes that the pretextual reason LASD decided upon to refuse to return persons' property, was that the property would be held as potential "evidence" for a purported "ongoing criminal investigation."

74. In fact, Plaintiff is informed and believes that LASD personnel know that the property the LASD withheld was *not* evidence of crime, nor was there any "ongoing criminal investigation" concerning Plaintiff. Instead, the true reason for LASD's refusal to return to persons like Plaintiff their property was that the LASD seized and withheld the property to punish Plaintiff and others for having exercised their free speech rights to document public assemblies or to protest police violence, including LASD shooting deaths of Los Angeles residents. Plaintiff is informed and believes and based thereon alleges that LASD supervisory personnel, including defendant Villanueva, retaliated against Plaintiff and others because these supervisors, aware that the then-Los Angeles County District Attorney Jackie Lacy would *not* file criminal charges against Plaintiff, to punish Plaintiff and others for having exercised free speech rights.

00156291.WPD

75. Plaintiff is informed and believes that LASD personnel decided upon a course of conduct to inflict summary punishment on protesters and those documenting the police response to the protest by (a) subjecting them to serious injuring force without justification; (b) arresting and booking them on charges for which LASD officials knew they did not have probable cause; (c) refusing to promptly release them on "cite and release" citations ordinarily required by LASD policy, choosing instead to deliberately prolong their incarcerations; and (d) refusing to return to them upon their release their property the LASD had seized without a warrant or other judicial review.

76. Defendants' claim of "ongoing criminal investigation" to justify not returning Plaintiffs' camera for six months was a pretext defendants (and their attorneys representing them in civil litigation) fabricated to coverup the true reason for the LASD refusal to return to Plaintiff and others their property -- defendants deliberately failed and refused to track to whom the property items LASD seized belong. But rather than acknowledge the LASD's failures or refusals to properly book protesters' property, defendants (and their attorneys) asserted the fabricated "ongoing criminal investigation."

77. Plaintiff is informed and believes and based thereon alleges that one of the policy makers referenced above, was defendant Villanueva.

### COUNT ONE

### Unreasonable Seizure

### (42 U.S.C. §1983 / Fourth Amendment)

78. By this reference Plaintiff re-alleges and incorporates all previous and following paragraphs as if fully set forth herein.

79. The seizure of Plaintiff by unknown LASD deputies on September 8, 2020, violated her Fourth Amendment rights against unreasonable seizures by:

A. Subjecting her to excessive force even though Plaintiff had not committed a crime and was not threatening harm to anyone; and,

B. Arresting her in the absence of probable cause that the Plaintiff had committed any crime.

00156291.WPD

80. The acts alleged herein were the product of a policy or custom of the Entity defendants and personally approved by defendant Villanueva as alleged above, and entitles Plaintiff to recover punitive damages as against individual defendants.

**COUNT TWO**

**Deprivation of Property**

**(42 U.S.C. § 1983 / Fourth & Fourteenth Amendments)**

81.   By this reference Plaintiff re-alleges and incorporates all previous and following paragraphs as if fully set forth herein.

82.   The initial and continued seizure of Plaintiff's personal property without a warrant or judicial review of any kind, deprived Plaintiff of property in violation of the Fourth and Fourteenth Amendments. Therefore, Plaintiff is entitled to recover compensatory damages proximately caused by the property seizure, as against all defendants.

83. The acts alleged herein were the product of a policy or custom of the Entity defendants and personally approved by defendant Villanueva as alleged above, and entitles Plaintiff to recover punitive damages as against individual defendants.

**COUNT THREE**

(As Against Entity Defendants Only)

**(42 U.S.C. §1983 / Fifth Amendment)**

84. By this reference Plaintiff re-alleges and incorporates all previous and following paragraphs as if fully set forth herein.

85. By seizing Plaintiff's items of personal property and not returning them for many months despite Plaintiff's requests, the Entity defendants physically took possession of Plaintiff's property ostensibly for a public purpose of punishing Plaintiff for her mere presence at the September 8, 2020 protest. Defendants, however, have not compensated Plaintiff but instead, effected a six month *de facto* forfeiture of her property. Consequently, the seizure without any judicial review constituted a "Taking" within the meaning of the Takings Clause of the Fifth Amendment to the United States Constitution.

86. Defendants' property seizures constituted a final decision. Per the policies described above, the Entity defendants did not provide any review process, judicial or otherwise, to challenge the property seizures.

87. Because the Entity defendants effected a Taking of personal property without payment of compensation, Plaintiff is entitled to recover the reasonable value of their property defendants seized.

## COUNT FOUR

### (42 U.S.C. § 1983 / First Amendment)

88. By this reference Plaintiff re-alleges and incorporates all previous and following paragraphs as if fully set forth herein.

89. Defendants' above-described conduct violates Plaintiff's rights to freedom of speech, assembly, and association under the First Amendment to the United States Constitution.

90. The acts alleged herein were the product of a policy or custom of the Entity defendants and personally approved by defendant Villanueva as alleged above, thereby entitling Plaintiff to recover punitive damages as against individual defendants.

## COUNT FIVE

### Privacy Protection Act of 1980 / 42 U.S.C. §§ 1983, 2000aa

91. By this reference Plaintiff re-alleges and incorporates all previous and following paragraphs as if fully set forth herein.

92. Defendants violated the Privacy Protection Act of 1980 ("PPA") by seizing Plaintiff's work product materials which Plaintiff collected to disseminate to the public as a photographer and failing to return her camera for six months containing her work product. The PPA makes it illegal for a government officer or employee "to search for or seize any work product materials" or documentary materials, related to the prosecution or investigation of a criminal offense, "possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper,... broadcast, or other similar form of public communication." 42 U.S.C. §2000aa (a), (b).

93. None of the exceptions listed under the PPA are applicable to Plaintiff. There is no reason to believe the seizure of her camera was necessary to prevent death or serious bodily injury. Nor was there reason to believe that notice of a subpoena for her photos and videos would result in their destruction.

94. As a photographer, Plaintiff used her camera and phone to record the September 8, 2020 protest to share that information with the public. Therefore, Defendants' seizure of Plaintiff's camera, and confiscating and searching her memory card was in direct violation of the PPA.

95. Therefore, under 42 U.S.C. §§ 1983 and 2000aa, Plaintiff is entitled to recover compensatory damages proximately caused by Defendants' invasion of Plaintiff's privacy.

## COUNT SIX

## (California Civil Code, § 52.1 / California Constitution, Article I, §§ 2, 3, 7, 13)

96. By this reference Plaintiff re-alleges and incorporates all previous and following paragraphs as if fully set forth herein.

97. Defendants' above-described conduct violates Plaintiff's rights under California Civil Code, §52.1, for which Plaintiff is entitled to damages under § 52.1(c), for the wrongful seizure of herself and her personal property, and entitled to declaratory and injunctive relief under § 52.1(c) for the wrongful seizures and withholding of her property.

98. Defendants' above-described conduct violates Plaintiff's rights under the California Constitution, Article I, §§ 2, 3, 7, 13, Cal. Civ. Code § 43, Cal. Pen. Code §§ 851.6(b), 853.6 for which Plaintiff can recover compensatory damages under the California constitution and Cal. Civ. Code § 52.1(c).

99. Defendants LASD and County are liable under Cal. Gov't Code § 815.2.

///

///

///

00156291.WPD

### COUNT SEVEN

### Penal Code § 853.6

### Fourteenth Amendment / 42 U.S.C. § 1983

100. By this reference Plaintiff re-alleges and incorporates all previous and following paragraphs as if fully set forth herein.

101. Plaintiff had a liberty interest created by California Penal Code § 853.6 to be cited and released for a misdemeanor absent specific information and individualized suspicion that she would immediately repeat the allegedly unlawful conduct if promptly released and not subjected to a prolonged detention. Defendants' conduct deprived Plaintiff of liberty without due process of law under the Fourteenth Amendment to the United States Constitution. Plaintiff was uniformly denied the mandatory "liberty" interest codified at California Penal Code § 853.6 when she was denied individualized assessment and held in custody overnight.

### COUNT EIGHT

### Violation of Penal Code § 851.6(b)

102. By this reference Plaintiff re-alleges and incorporates all previous and following paragraphs as if fully set forth herein.

103. LASD violated Plaintiff's rights by not issuing her a Certificate of Detention after she was released from custody on the misdemeanor citation and the District Attorney declined to press charges against her, both she the case was presented to the District Attorney by the LASD and when the one-year statute of limitations expired on September 8, 2021, as required by California Penal Code § 851.6(b).

### PRAYER

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

104. That this Court award Plaintiffs attorneys fees and costs incurred in this action under 42 U.S.C. § 1988, Cal. Civ. Code § 52.1(i), Cal. Civ. Proc. Code § 1021.5, California's private attorney general's doctrine, and any other appropriate statute;

00156291.WPD

105. That this Court award Plaintiffs compensatory damages, according to proof;

106. That as against any individual defendant, that Plaintiffs be awarded punitive damages according to proof;

107. That this Court award Plaintiffs attorneys fees and costs incurred in this action under 42 U.S.C. § 1988, Cal. Civ. Code § 52.1(I), Cal. Civ. Proc. Code § 1021.5, California's private attorney general's doctrine, and any other appropriate statute;

108. That the Court award costs of suit; and

109. And such other relief as the Court deems appropriate.

DATED:  June 21, 2023

**COLLEEN FLYNN**
**DONALD W. COOK**
Attorneys for Plaintiff

By _____
                    Donald W. Cook

-22-

00156291.WPD

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial.

DATED: June 21, 2023

**COLLEEN FLYNN**
**DONALD W. COOK**
Attorneys for Plaintiff

By _____
                    Donald W. Cook

00156291.WPD