**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JULIANNA LACOSTE,<br>Plaintiff,<br>v.<br>COUNTY OF LOS ANGELES, et al.,<br>Defendants. | Case No. CV 23-4917 DMG (AGRx)<br><br>**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT [110] [123] AND PLAINTIFF'S MOTION FOR SANCTIONS [124]** |

Before the Court are three motions: (1) a Motion for Partial Summary Judgment filed by Plaintiff Julianna Lacoste [Doc. # 110 ("PMSJ")]; (2) a Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment filed by Defendants County of Los Angeles ("the County"), Los Angeles County Sheriff's Department ("LASD"), former LASD Sheriff Alex Villanueva, and LASD Deputy Sheriffs Nathan DeBoom, Aaron Escobedo, Jose Hurtado, Charles McDaniel, Jose Ramirez, Spencer Zagurski, Juan Meza, Ramon Munoz, Robert Okamoto, Adrian Ruiz, Brian Muller, Ryan Bergner and Laina Do (collectively, "Defendants")[1] [Doc. # 123 ("DMSJ")]; and (3) Plaintiff's Motion for Sanctions Regarding Destruction of Evidence [Doc. # 124 ("MFS")]. All three motions are fully briefed. [Doc. ## 114 ("PMSJ Opp."), 116 ("PMSJ Reply"), 127 ("DMSJ Opp."), 133 ("DMSJ Reply"), 126 ("MFS Opp."), 134 ("MFS Reply").] The Court held a hearing on August 7, 2026.

Having carefully considered the parties' arguments, the Court issues the following omnibus ruling as to the three pending motions.

## I.

## PROCEDURAL BACKGROUND

Plaintiff Julianna Lacoste filed the instant action on June 21, 2023, against Defendants County of Los Angeles, LASD, former LASD Sheriff Alex Villanueva, and 13 individual LASD Deputies, alleging eight causes of action arising from a protest event in South Los Angeles on September 8, 2020. [Doc. # 1.] On March 28, 2025, the Court granted in part and denied in part Defendants' Motion for Judgment on the Pleadings and granted Lacoste's Motion for Leave to Amend her Complaint. [Doc. # 74.] Subsequently, Lacoste filed a First Amended Complaint ("FAC") [Doc. # 75] and

---

[1] At times throughout this Order, the Court will refer to the Defendants as follows: (1) "Entity Defendants" include the County and the LASD; (2) "Deputy Defendants" include LASD Deputies Nathan DeBoom, Aaron Escobedo, Jose Hurtado, Charles McDaniel, Jose Ramirez, Spencer Zagurski, Juan Meza, Ramon Munoz, Robert Okamoto, Adrian Ruiz, Brian Muller, Ryan Bergner and Laina Do; (3) "Individual Defendants" includes all 13 Deputy Defendants, plus former LASD Sheriff Alex Villanueva.

Defendants moved to dismiss the state law claims therein [Doc. # 76].[2] On August 29, 2025, the Court granted Defendants' motion to dismiss the state law claims in the FAC, without leave to amend. [Doc. # 83.]

On May 18, 2024, Lacoste filed a second, related action arising from the same protest event against LASD Deputies Ryan Bergner and Laina Do in *Julianna Lacoste v. Ryan Bergner, et al.*, Case No. CV 24-4166-DMG (PDx) (C.D. Cal.). On November 5, 2025, the Court consolidated the two actions and subsequently ordered Lacoste to file a consolidated amended complaint. [Doc. ## 94, 98.]

On November 28, 2025, Lacoste filed her Consolidated Second Amended Complaint ("CSAC") against the County, LASD, former LASD Sheriff Alex Villanueva (in his individual capacity), and LASD Deputies Nathan DeBoom, Aaron Escobedo, Jose Hurtado, Charles McDaniel, Jose Ramirez, Spencer Zagurski, Juan Meza, Ramon Munoz, Robert Okamoto, Adrian Ruiz, Brian Muller, Ryan Bergner and Laina Do.[3] [Doc. # 99.] Lacoste alleges the following five federal claims: (1) violation of the Fourth Amendment under 42 U.S.C. section 1983 for excessive force and false arrest (against all Defendants); (2) violations of the Fourth and Fourteenth Amendments under Section 1983 for unlawful deprivation of property (against all Defendants); (3) violation of the Fifth Amendment under Section 1983 for unlawful takings (against Entity Defendants only); (4) violation of the First Amendment under Section 1983 (against all Defendants); (5) and violation of the Privacy Protection Act of 1980, 42 U.S.C. § 2000aa, under

---

[2] The FAC alleged the following eight causes of action: (1) excessive force and false arrest in violation of the Fourth Amendment; (2) unlawful deprivation of property in violation of the Fourth and Fourteenth Amendments; (3) unlawful takings under the Fifth Amendment; (4) violation of Lacoste's First Amendment rights to freedom of speech, assembly, and association; (5) violation of the Privacy Protection Act of 1980, 42 U.S.C. § 2000aa; (6) violation of California's Bane Civil Rights Act, Cal. Civ. Code § 52.1; (7) violation of California Penal Code section 853.6; and (8) violation of California Penal Code section 851.6(b). *See generally* FAC.

[3] The CSAC also named LASD Deputies Mikah Lopez, Mark Reyes, and Michael Mileski as defendants. On May 27, 2026, the parties stipulated to dismiss those three deputy defendants from the action. [Doc. ## 130, 131.]

Section 1983 (against Entity Defendants only). *Id.* at ¶¶ 78–96. Now, Lacoste and Defendants each move for summary judgment or partial summary judgment.

## II.

## FACTUAL BACKGROUND[4]

The Court relies on the following filings and underlying exhibits to formulate this factual background: (1) Lacoste's Statement of Uncontroverted Facts [Doc. # 110-1 ("PSUF")], Defendants' Statement of Genuine Issues and Additional Material Fact [Doc. # 114-1 ("DSGI" or "DAMF")], and Lacoste's responses thereto [Doc. # 116-1]; and (2) Defendants' Statement of Uncontroverted Facts [Doc. # 123-1 ("DSUF")], Lacoste's Statement of Genuine Disputes and Additional Material Fact [Doc. # 127-1 ("PSGD" or "PAMF")], and Defendants' responses thereto [Doc. # 133-1]. The Court has also reviewed the video exhibits lodged by Plaintiff.[5] [Doc. # 139.]

### A. September 8, 2020 Protest

For several days in September 2020, demonstrators gathered to protest the killing of Dijon Kizzee by LASD deputies. PSUF at ¶ 1. One such demonstration took place on September 8, 2020 ("September 8 Protest"), near the South Los Angeles LASD station ("SLA Station"), at the intersection of Imperial Highway and Normandie Avenue. *Id.*

The LASD Special Response Team ("SRT") specializes in crowd and riot control, and facility protection. DSUF at ¶ 2. Lieutenant Charles McDaniel, Sergeant Brian

---

[4] The facts in this section are uncontroverted, unless otherwise stated. When the parties' purportedly disputed facts are not in fact controverted by the evidence, the Court cites to them as uncontroverted facts. In situations where the parties' characterization of evidence in their statement of facts is unsupported by the cited evidence, the Court refers directly to the evidence in formulating this factual background. The Court has reviewed the entire record but only discusses the uncontroverted facts that are necessary to or affect its analysis. The Court rules on the evidentiary objections only insofar as the evidence is relevant to the Court's analysis. To the extent the Court does not rely on evidence to which an evidentiary objection was interposed, the objection is **OVERRULED** as moot.

[5] When confronted with a videotape of the events in question, the Court must "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). And "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by [the video], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

Muller, Sergeant Ryan Bergner, and LASD Deputies Nathan DeBoom, Aaron Escobedo, Jose Hurtado, Robert Okamoto, Jose Ramirez, Adrian Ruiz, and Spencer Zagurski, were members of the SRT deployed to the September 8 Protest.[6] DSUF at ¶ 1. Lieutenant McDaniel directly supervised and commanded the SRT team outside of the SLA Station. PAMF at ¶ 6. Sergeant Muller served as the Platoon Sergeant, so his duty was to "coordinate the platoon movement," including by "supervising and positioning the platoon overall." DAMF at ¶ 1; Declaration of Brian Muller ("Muller Decl.") at ¶ 4 [Doc. # 123-2]. At around 4:00 p.m., SRT established a perimeter in front of the SLA Station. DSUF at ¶ 10.

Lacoste is an independent journalist and photographer. PSUF at ¶ 3. She attended the September 8 Protest to document it using her professional Nikon D5000 camera and cell phone. PSUF at ¶ 4; Defendants' Compendium of Exhibits ISO DMSJ, Ex. 22 ("Lacoste Depo.") at 38:5–15, 60:2–10, 61:3–10 [Doc. # 123-2]. Lacoste drove to the protest alone and arrived around 7:30 p.m. PSUF at ¶ 4; DSUF at ¶ 26; Declaration of Colleen Flynn ISO PMSJ ("Flynn Decl."), Ex. C ("Lacoste Depo.") at 41:14–18 [Doc. # 110-7]. At the time of her deposition, Lacoste did not remember the exact street she parked on, but she remembered it was on a north/south street generally near the SLA Station. Lacoste Depo. at 48:13–49:16. She wore a lanyard around her neck with credentials issued by the National Press Photographers Association, a helmet for safety reasons, and a black backpack containing personal items. PSUF at ¶¶ 3, 7–8. At around 8:00 p.m., Lacoste took photographs of LASD deputies with her camera and used her phone to livestream them. *Id.* at ¶ 9.

At approximately 8:10 p.m., Sergeant Muller declared an unlawful assembly because of certain protesters' behavior and ordered the crowd to disperse using a speaker system located on a LASD Sound Truck. PSUF at ¶ 10; DAMF at ¶ 2; DSUF at ¶ 14.

---

[6] LASD Deputy Laina Do, Sergeant Juan Meza, and Sergeant Ramon Munoz were not members of the SRT and were not a part of the crowd-control operation at the September 8 Protest. DSUF at ¶ 4. Former LASD Sheriff Alex Villanueva was also not a member of the SRT at the September 8 Protest. Declaration of Brian Muller ("Muller Decl.") at ¶ 15 [Doc. # 123-2].

Sergeant Muller instructed the crowd to leave "the area" by 8:25 p.m. Defendants' Compendium of Exhibits ISO DMSJ, Ex. 7 ("Bergner Report") at 2 [Doc. # 123-2]. Sergeant Muller repeated the dispersal orders several times and directed the crowd to proceed westbound on Imperial Hwy., or northbound on Normandie Ave., away from the SLA Station. DSUF at ¶ 15; PSUF at ¶ 15. During his deposition, Sergeant Muller described the effort to disperse the crowd as wanting everyone to: "Leave the area. Go to their cars. Go to their homes. Go to their bicycle. Go northbound. Go westbound. Go eastbound. But leave the area." Defendants' Compendium of Exhibits ISO PMSJ Opp., Ex. B ("Muller Depo.") at 62:8–19 [Doc. # 114-2].

Lacoste understood that the announcements were directing people to disperse, so she walked west on Imperial Hwy. before turning north on Normandie Ave. PSUF at ¶¶ 11, 13. She used her phone and camera to film deputies while she walked backwards on Normandie Ave. PSUF at ¶ 13. Sergeant Muller followed LASD personnel on foot, moving northbound on Normandie Ave. DAMF at ¶ 3. Sergeant Muller directed people to move off the street, so Lacoste walked onto the sidewalk at the northeast corner of Imperial Hwy. and Normandie Ave. and continued to film the deputies. PSUF at ¶ 14.

As Lacoste and others moved north on Normandie Ave., certain protesters started "launching frozen water bottles and miscellaneous fireworks in the direction of SRT."[7] Bergner Report at 3. In response, Sergeant Bergner gave SRT deputies a command to use force. Defendants' Compendium of Exhibits ISO DMSJ, Ex. 23 ("Bergner Depo.") at 86:13–19 [Doc. # 123-2]. Sergeant Bergner continued to give commands to use force along Normandie Ave. in response to certain protesters throwing objects. *Id.* at 86:20–87:11; Bergner Report at 3–5. Meanwhile, Sergeant Muller continued to make dispersal orders while following on foot. DAMF at ¶ 3; Bergner Report at 3–5; Bergner Depo at 86:6–12, 87:12–16. Lacoste ran north on Normandie Ave. towards 110th St. PSUF at ¶

[7] Sergeant Bergner did not deploy any less lethal munitions himself during the protest. Declaration of Ryan Bergner ("Bergner Decl.") at ¶ 8 [Doc. # 123-2].

20. Lacoste was not struck by any less lethal rounds or otherwise injured while she was on Normandie Ave. *Id.* at ¶ 19.

Sergeant Bergner testified that the last use of force occurred at the intersection of Normandie Ave. and 110th St., and no additional force was needed after that. Flynn Decl., Ex. H ("Bergner Depo.") at 89:7–90:1 [Doc. # 110-9]. The crowd dispersed northbound on Normandie Ave. and along 110th St. *Id.* Any documented acts of violence or threats of violence occurred along Normandie Ave., and at the intersection of Normandie Ave. and 110th St. PSUF at ¶ 31. Sergeant Bergner documented all uses of force reported to him by his SRT deputies. *See* Bergner Report. None of the SRT deputies reported deploying of less lethal munitions around the one-half block east of Normandie Ave. on 110th St. Bergner Decl. at ¶ 7.

**B. Lacoste's Arrest**

Lacoste turned right onto 110th St. and headed east, intending to get to her car to go home. PSUF at ¶ 21. 110th St. is a residential street. *Id.* Although Lacoste's car was not parked on 110th St., she believed turning onto 110th St. was "going towards" her car. Lacoste Depo. at 51:7–9, 46:4–11. Once she was on 110th St., Lacoste stopped running and started walking because she believed she was safe and "saw other people walking and behaving normally." PSUF at ¶ 22; Lacoste Depo. at 45:18–25. Lacoste interacted with some protesters briefly and saw a group of protesters run by her into a gate. Lacoste Depo. at 195:12–18.

Meanwhile, when Sergeant Muller saw "a whole bunch of people" go "eastbound on 110th Street," he instructed an SRT driver to "be a blocking force" on 110th St. Muller Depo. at 67:15–68:7. According to Sergeant Muller, the purpose of blocking protesters in the middle of the street was to make arrests for failing to disperse. *Id.* at 68:5–24. When asked in deposition whether he knew who made the decision to make arrests, Sergeant Muller stated: "I think that defaults on the decision to declare unlawful assembly and disburse [sic] the area, and when they failed to do that, that's a defaulted decision to make arrests when they don't leave." *Id.* at 70:17–24.

While standing on a sidewalk near 1234 W. 110th St., Lacoste was struck with kinetic impact rounds on the side of her head, her hand, and the back of her shoulder.[8] PSUF at ¶¶ 28, 35; Lacoste Depo. at 34:5–35:4. The force of the less lethal round on the side of her head caused her helmet to snap off. PSUF at ¶ 35. Lacoste did not personally observe any deputy aiming a weapon at her before she was struck. Lacoste Depo. at 31:4–7. She also did not hear any warnings or verbal commands while she was on 110th St. PSUF at ¶ 34.

After being struck by the less lethal rounds, Lacoste crouched behind a car near 1234 W. 110th St. Lacoste Depo. at 35:19–36:14. Less than a minute later, an unidentified LASD deputy grabbed her by her ponytail, pushed her body and face down on the street, kneeled on the back of her neck, put handcuffs on her, and ripped her up from the ground. *Id.* at 96:6–15, 100:11–21; PSUF at ¶¶ 36, 38. At the time, Lacoste's camera was hanging around her neck and the camera broke under her due to the force of her fall. PSUF at ¶ 37. As a result, Lacoste suffered injuries to her neck and chest. *Id.* at ¶ 36. Lacoste also suffered bruising on her wrists from the handcuffs and received stitches on her hand where she was shot. *Id.* at ¶ 39. The parties dispute the exact time that Lacoste was arrested. [*See* Doc. # 133-1 at ¶ 32.] Defendants contend Lacoste was arrested around 9:20 p.m., while Plaintiff asserts she was arrested around 8:40 p.m.[9] *See id.*; PAMF at ¶ 1.

---

[8] 1234 West 110th St. is approximately half a mile from the intersection of Imperial Hwy. and Normandie Ave., where Sergeant Muller made his initial dispersal orders. Flynn Decl., Ex. G [Doc. # 110-8]. 1234 W. 110th St. is approximately 1,000 feet from the intersection of Normandie Ave. and 110th St. PSUF at ¶ 30.

[9] Defendants point to a "Los Angeles County Jail Booking and Property Record" and "Los Angeles County Released Form" which both indicate that Lacoste was arrested at 9:20 p.m. Defendants' Compendium of Exhibits ISO DMSJ, Exs. 9–10 [Doc. # 123-2]. Plaintiff objects to this evidence as inadmissible hearsay. *See* PSGD at ¶ 32. The Court **OVERRULES** Plaintiff's objection. *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("[A]t summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial . . . ."); *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents.").

Lacoste was arrested for failing to disperse in response to a declaration of unlawful assembly, in violation of California Penal Code section 409.[10] PSUF at ¶ 42. Deputy Laina Do was listed as the arresting officer on a LASD Booking and Property Report. PSUF at ¶ 63. Deputy Do was not the officer, however, who arrested Lacoste. PSUF at ¶ 64. On September 8, 2020, Deputy Do was assigned to work at the SLA Station, answering calls and assisting in the booking of arrested individuals. Declaration of Laina Do ("Do Decl.") at ¶ 3 [Doc. # 123-2]. Deputy Do was ordered to list herself as the arresting officer by a superior, even though her role was merely to process arrestees who were brought to the LASD station. Flynn Decl., Ex. P ("Do Depo.") at 46:2–47:1 [Doc. # 110-16]. A LASD Incident Report authored by non-defendant Deputy Fernando Lizarraga identified Lacoste as one of 17 people arrested at the September 8 Protest. PSUF at ¶ 66; Defendants' Compendium of Exhibits ISO DMSJ, Ex. 8 ("Lizarraga Report") [Doc. # 123-2]. Deputy Lizarraga was not one of the deputies deployed to the September 8 Protest—instead, he was at the LASD station responding to calls for service. PSUF at ¶ 67. Neither Deputy Do nor Deputy Lizarraga have any personal knowledge of Lacoste's actions at the protest. *Id.* at ¶¶ 64, 68.

According to Sergeant Bergner, none of the SRT deputies under his supervision—including Deputies Escobedo, Hurtado, Okamoto, Ramirez, Ruiz, and Zagurski—arrested any protesters at the September 8 protest. Bergner Decl. at ¶ 9. Deputy Deboom and

---

Meanwhile, Plaintiff deconstructs a video taken by another protest attendee, Hugo Padilla, to ascertain Plaintiff's time of arrest as being around 8:40 p.m. *See* Flynn Decl., Ex. D [Doc. # 110-3 at ¶ 3A]; Declaration of Donald Cook ISO DMSJ Opp. ("Cook Decl. ISO DMSJ Opp.") at ¶¶ 4–5 [Doc. # 127-3]. Defendants object to Cook's declaration based on lack of personal knowledge. [Doc. # 133-1 at 79.] Notably, the video taken by Padilla does not capture Lacoste's arrest, nor does it include any time stamps. *See* Flynn Decl., Ex. D. Cook's narration of what the video purports to show constitutes attorney argument, rather than admissible evidence. Based on the Court's review of the video, however, it is possible that the contents of Cook's narrative could be provided in an admissible form at trial by a percipient witness. *See JL Beverage Co.., LLC*, 828 F.3d at 1110. Therefore, the Court **OVERRULES** Defendants' objection. At the summary judgment stage, the Court does not resolve conflicts in evidence. The parties' competing evidence clearly shows a material dispute of fact.

[10] Lacoste did not engage in any acts of violence during her attendance at the September 8 Protest, and was not intoxicated. PSUF at ¶¶ 18, 27, 44.

Sergeant Muller also attest that they did not physically detain or arrest any individual on September 8, 2020. Declaration of Nathan Deboom ("Deboom Decl.") at ¶ 8 [Doc. # 123-2]; Muller Decl. at ¶ 8.

**C. Post-Arrest & Release**

LASD deputies transported Lacoste and other arrestees to the SLA Station. PSUF at ¶¶ 41, 66; DSUF at ¶ 34. At the time, Lacoste's Nikon camera was still around her neck, but there was no lens attached to the camera. DSUF at ¶ 35. At the SLA Station, Lacoste's backpack and camera were cut off of her by LASD personnel. PSUF at ¶ 45; Lacoste Depo. at 116:1–10. Lacoste's camera was booked into evidence, but the 88mm camera lens was not. DSUF at ¶ 36.

Subsequently, Lacoste was transported to UCLA Harbor Medical Center for medical treatment. DAMF at ¶ 7. After receiving medical treatment, LASD transported Lacoste back to the SLA Station. PSUF at ¶ 48. At around 10 a.m. on September 9, 2020, Lacoste was told that she would be transported to County jail, however the County jail would not admit her because she had a fever and other injuries. *Id.* at ¶¶ 48–50. LASD set Lacoste's bail at $5,000 rather than releasing her on her own recognizance. *Id.* at ¶ 55. LASD released Lacoste after 3:00 p.m. on September 9, 2020. *Id.* at ¶ 55; DSUF at ¶ 37. Lacoste was detained for a total of 19 hours. PSUF at ¶ 42. Upon release from custody, LASD deputies returned Lacoste's wallet, keys, and press badge to her. Lacoste Depo. at 116:12–117:10. Lacoste asked for her camera back, but was told that LASD was keeping it as evidence. PSUF at ¶ 56. Lacoste does not think she ever received her black backpack back, which contained small personal items, such as a pair of sunglasses, pens, and makeup. Lacoste Depo. at 116:12–117:6, 177:12–16.

According to Sergeant Bergner, none of the SRT deputies under his supervision—including Deputies Escobedo, Hurtado, Okamoto, Ramirez, Ruiz, and Zagurski—participated in booking procedures at the SLA Station on September 8, 2020. Bergner Decl. at ¶ 10. These deputies also did not process or handle any personal property or items belonging to the arrestees on September 8, 2020. *Id.* Deputy Deboom and

Sergeant Muller also did not participate in Lacoste's booking procedures or the handling of her personal property. Deboom Decl. at ¶¶ 9–10; Muller Decl. at ¶ 8.

**D. Retention & Release of Lacoste's Camera**

On September 9, 2020, LASD received a search warrant issued by Judge Margaret M. Bernal of the Superior Court, County of Los Angeles, authorizing the search and seizure of 17 cell phones. Defendants' Compendium of Exhibits ISO DMSJ, Ex. 11 [Doc. # 123-2]. Although Lacoste's camera was listed as an item seized during the arrest, the search warrant issued by Judge Bernal did not authorize a search or seizure of the camera. *See id.* Defendants neither admit nor deny whether LASD searched the contents of Lacoste's camera. Flynn Decl., Ex. T [Doc. # 110-20].

At some point, Lacoste called the SLA Station to ask for her camera back, and she was instructed to speak to a detective who subsequently told her there was "no record of what was [hers]." Lacoste Depo. at 191:14–25. After she emailed a detective a picture of herself with the camera, she was instructed to pick up the camera at the station. *Id.* Lacoste received her camera back on March 4, 2021, approximately six months after her arrest. PSUF at ¶ 58; DSUF at ¶ 38.

**E. LASD Policies**

The LASD maintains written policies pertaining to responses to emergencies and disasters, use of force, arrests based on probable cause, field operations, and property and evidence procedures. *See* Defendants' Compendium of Exhibits ISO DMSJ, Exs. 3–6 [Doc. # 123-2].

**F. Plaintiff's Request for Judicial Notice**

Plaintiff requests that the Court take judicial notice of several orders and numerous declarations filed in different actions, under Federal Rule of Evidence 201. [Doc. # 127-2 ("RJN").] Specifically, Plaintiff requests judicial notice of: (1) orders issued in *Berg, et al. v. County of Los Angeles, et al.*, No. CV 20-7870-DMG (KESx) (C.D. Cal.) and *Astorga, et al. v. County of Los Angeles, et al.*, No. CV 20-9805-AB (AGRx) (C.D. Cal.); and (2) 20 declarations filed in the aforementioned cases. *Id.*

Federal Rule of Evidence 201 permits a court to take judicial notice of facts "not subject to reasonable dispute" and that the court "can accurately and readily determine from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts "may take judicial notice of 'matters of public record.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), *overruled on other grounds by G.B. by and through G.P. v. U.S. Env't Prot. Agency*, 172 F.4th 1042 (9th Cir. 2026). Documents on file in federal or state courts are considered undisputed matters of public record. *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012). While courts may take notice of the *existence* of such filings, courts cannot take judicial notice of the truth of the facts recited therein. *Lee*, 250 F.3d at 689–90. "[D]eclarations are not judicially noticeable because they are not facts 'generally known' in the community and are not 'capable of accurate and ready determination.'" *Stamas v. Cnty. of Madera*, 795 F. Supp. 2d 1047, 1060 (E.D. Cal. 2011). While the Court may take judicial notice that the declarations were filed in another action, the Court may not take judicial notice of the underlying factual content. *Id.*

Accordingly, the Court **GRANTS** Lacoste's RJN only insofar as the Court will take judicial notice of the existence of the filings.

## III.

## LEGAL STANDARD

### A. Sanctions Under Federal Rule of Civil Procedure 37(e)

"Spoliation of evidence is the 'destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation.'" *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009) (citation omitted). Generally, district courts have two sources of authority under which it can sanction a party who has despoiled evidence: "the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37[.]" *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). Applicable here is the Court's authority to sanction under Federal Rule of Civil

Procedure 37(e) ("Rule 37(e)"). *See Gregory v. State of Montana*, 118 F.4th 1069, 1080 (9th Cir. 2024) (Rule 37(e), by its plain terms, "displaces the district court's power to invoke inherent authority in fashioning sanctions for the sort of failure to preserve 'electronically stored information'").

Under Rule 37(e), sanctions may be available if "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). There are two categories of sanctions under Rule 37(e). First, if the Court finds that the moving party is prejudiced by the loss of information, the Court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Second, if the Court finds that the nonmoving party "acted with the intent to deprive another party of the information's use in the litigation," the Court may do one of the following: (1) "presume that the lost information was unfavorable to the party"; (2) "instruct the jury that it may or must presume the information was unfavorable to the party"; or (3) "dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2)(A)–(C). A showing of prejudice is not required under Rule 37(e)(2). *See Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 736 (9th Cir. 2024).

Courts in the Ninth Circuit apply the preponderance of the evidence standard of proof for spoliation motions. *See Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1052–53 (S.D. Cal. 2015) (collecting cases); *see also RG Abrams Ins. v. Law Offices of C.R. Abrams*, 342 F.R.D. 461, 502 (C.D. Cal. 2022); *OmniGen Research v. Yongqiang Wang*, 321 F.R.D. 367, 372 (D. Or. 2017); *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 335 (D. Az. 2022). When considering a motion for sanctions, a district court may make factual findings and assess credibility of witnesses. *See Leon*, 464 F.3d at 958.

//

//

**B. Summary Judgment**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient[.]" *Anderson*, 477 U.S. at 252. "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.*

**IV.**

**DISCUSSION**

**A. Plaintiff's Motion for Sanctions**

Plaintiff seeks sanctions against Defendants under Federal Rule of Civil Procedure 37(e) for purportedly destroying recorded radio transmissions from the September 8 Protest. *See generally* MFS. The remedy Plaintiff seeks is as follows: "this Court

finding that defendants destroyed the recordings because the recordings would have identified the deputies who arrested Plaintiff and used force against her; and thus, the appropriate remedy is that arresting Plaintiff and using force against her followed by refusing [to] release her on her own recognizance, were the result of a County and LASD policy, practice or custom." *Id.* at 15–16.[11]

**1. Timeliness of Plaintiff's MFS**

Defendants contend that Lacoste's motion should be denied as untimely because it was filed after the discovery cut-off and the deadline for discovery motions. MFS Opp. at 9. Plaintiff's MFS, filed on May 15, 2026, is untimely. The discovery cut-off date, which includes the hearing of discovery motions, was on April 30, 2026. [Doc. ## 109, 94.] "Many courts have found that because spoliation is a discovery-related issue, motions for spoliation sanctions typically must be brought during the discovery period." *Gault v. United States*, No. CV 20-10687-PA (PVC), 2022 WL 4292340, at *7 (C.D. Cal. Aug. 23, 2022) (collecting cases), *report and recommendation adopted*, 2022 WL 4291320 (C.D. Cal. Sept. 15, 2022). Other courts have "allowed parties to raise spoliation claims after discovery has closed" so long as it is as soon as reasonably possible after discovering the facts underlying the motion. *Id.* (collecting cases).

Here, Plaintiff acknowledges that Defendants provided their supplemental response on March 12, 2026, indicating the radio transmissions at issue were not located or able to be retrieved. MFS Reply at 3. Yet, Plaintiff waited two months to file her MFS, after all deadlines for filing motions had expired. Even if the Court assumes that the MFS is not a "discovery motion," the general motion filing cut-off date was May 8, 2026. *Id.* Both the fact discovery and motion filing cut-off dates were stipulated to by the parties themselves. [Doc. # 107.] In approving the parties' stipulation, the Court admonished the parties to "avoid submitting requests for continuance or extension of time less than five court days prior to the expiration of the scheduled date." [Doc. # 109 at 2.] Not only

[11] All page references are to page numbers inserted by the CM/ECF system.

did Plaintiff fail to seek modification of the Court's scheduling order prior to filing her MFS, as required under Federal Rule of Civil Procedure 16(b)(4), but she also plainly ignored Defendants' argument about untimeliness in her MFS Reply.[12] *See generally* MFS Reply. Deadlines in federal court are not mere suggestions to be ignored at the parties' discretion.

Although the Court could deny Plaintiff's motion for being untimely and/or for failure to respond to Defendants' untimeliness argument, the Court will exercise its discretion to address the merits of the MFS. Defendants' request to deny the MFS as untimely is **DENIED**.

**2. Relevant Facts**

**a. LASD Radio Channels**

LASD personnel use a variety of different radio channels to communicate, including "main dispatch channels" and "tactical channels." Declaration of Michael Morreale ("Morreale Decl.") at ¶ 6 [Doc. # 126-1]. The Sheriff's Communication Center ("SCC") "maintains recording systems for certain LASD radio traffic and directly monitors LASD's main dispatch channels." *Id.* at ¶ 2. "Main dispatch channels" are those used by SCC dispatchers "to communicate with deputies in the field during day-to-day operations." *Id.* at ¶ 6. "Tactical channels," on the other hand, "are used for specific incidents so that radio traffic for that incident does not unnecessarily congest the main dispatch channel." *Id.* at ¶ 7.

Not all LASD transmissions are recorded and/or retained by SCC. *Id.* at ¶ 5. Whether a radio transmission is recorded depends on "whether the transmission reaches SCC's servers, and whether the communication is made through a repeater or in

[12] The Court notes this is not the first time Plaintiff has filed documents without properly seeking leave from the Court. *See* Order Re Defendants' Motion to Strike Plaintiff's CSAC [Doc. # 105] (denying Defendants' motion to strike and granting Plaintiff leave to amend CSAC to add a defendant even though the deadline to amend pleadings expired and Plaintiff had not requested leave from the Court). Plaintiff's counsel should re-examine its litigation practices and procedures in this regard. Although this Court prefers to consider matters on the merits rather than rely on procedural defaults, not all courts follow the same approach nor should counsel repeatedly test the procedural boundaries.

direct/simplex mode." *Id.* at ¶ 9. If the communication is made through a "repeater," then it will reach SCC's recording system and will normally be recorded by SCC. *Id.* at ¶ 10. Alternatively, if the communication is made in "direct/simplex mode," then the deputies merely communicate "radio-to-radio" with nearby deputies, and the transmission does not reach SCC's recording servers. *Id.* at ¶ 11. Transmissions that are recorded by the SCC servers are retained for approximately three years, after which they are automatically deleted. *Id.* at ¶ 14.

**b. SRT Tactical Frequency**

According to Sergeant Muller, each SRT deputy at the September 8 Protest was issued an "ear piece to go to their radio for easier communication with the supervisors or other deputies or from the deputies to the teams." Declaration of Colleen Flynn ISO MFS ("Flynn Decl. ISO MFS"), Ex. G ("Muller Depo.") at 14:4–15 [Doc. # 124-9]. The SRT used radio communications on a "tactical frequency" during the protest. *Id.* at 153:22–154:2. They did not use the "station's frequency" because doing so would have cluttered the frequency used for regular patrol, i.e., operations unrelated to the protest. *Id.* at 154:3–13. The SRT used several tactical frequencies that day. *Id.* at 154:14–18. Sergeant Muller testified that the tactical frequencies are not ordinarily recorded and would not be transmitted to the SCC. *Id.* at 154:19–155:12.

**c. Thomas Barham Declaration**

Lacoste submitted a Declaration by Thomas Barham, Jr. in support of her MFS. [Doc. # 124-2 ("Barham Decl.").] Barham was employed by LASD from January 1969 to October 1981. *Id.* at ¶ 2. Since leaving LASD 45 years ago, Barham has worked as a licensed attorney and as a "consultant on police procedures and practices." *Id.* at ¶¶ 6–7. Barham makes a variety of assertions about protocol and actions he would have expected LASD to take during the September 8 Protest. [13]

---

[13] Defendants filed evidentiary objections to the Barnham Decl. [Doc. # 126-2.] The Court will only address the objections insofar is it relies on the evidence to which an objection has been interposed. To the extent the Court does not rely on the challenged evidence, the Court **OVERRULES** the objections as **MOOT**.

In relevant part, Barham asserts the following:

- "Given LASD's procedures and the size and scope of this particular incident, throughout this event I would have expected deputies and their team leaders to radio their locations and provide situation report updates to the incident commander so he/she could provide directions to subordinates." Barham Decl. at ¶ 16.
- "LASD has long required deputies to radio when they make arrests by stating their unit number, '10-15' code and location. The code '10-15' means person in custody.'" *Id.* at ¶ 20.
- "When the arrested person is a female, there is the additional LASD mandate to broadcast via radio the starting and ending mileage when transporting the female." *Id.* at ¶ 21.
- "Thus when Ms. Lacoste was arrested, per LASD procedures there would have been the '10-15' radio transmission followed by transporting deputy identifying his/her call sign, [] stating the time and the location of Ms. Lacoste's arrest." *Id.* at ¶ 22.[14]
- "I would have expected evidence of the mandated radio transmissions, computer assisted dispatch system (CAD) and deputy daily worksheets to reflect all the above information along with the ending mileage at time of arrival at the South LASD station for booking." *Id.* at ¶ 23.

**d. Litigation**

On August 9, 2023, Lacoste served the Entity Defendants with her Complaint, along with her First Set of Requests for Production ("RFP"). Flynn Decl. ISO MFS, Ex. E [Doc. # 124-7]. The RFP requested "Any and all WRITINGS concerning the INCIDENT. This includes but is not limited to: A. The complete, unedited recordings of any and all radio, telephone, audio or video concerning the INCIDENT." *Id.* On March 6, 2026, Defendants indicated that "no responsive records have been located after a renewed inquiry with the LASD" regarding any "LASD radio broadcasts, including tactical frequency recordings, regarding the September 8, 2020 protest." Flynn Decl. ISO MFS, Ex. H [Doc. # 124-10]. On March 12, 2026, Defendants provided a supplemental

[14] Defendants object to this paragraph as "vague and ambiguous" because Barham "does not identify, through admissible and competent evidence, which LASD procedure required a '10-15' radio transmission under the circumstances at issue." [Doc. # 126-2 at 2.] A vagueness objection goes to the form of a question, rather than to its admissibility. Defendants' objection is **OVERRULED**.

response indicating that "[w]ith respect to LASD radio broadcasts, including tactical frequency recordings, regarding the September 8, 2020 protest, any such broadcasts are not available to be retrieved." [Doc. # 134-4.]

**3. Spoliation**

Lacoste claims Defendants destroyed radio recordings that "likely would have identified the deputies responsible" for shooting her with less-lethal munitions, arresting her, and refusing to release her on her own recognizance. MFS at 8. Defendants' first argument is that Lacoste has failed to show that the radio transmissions she seeks were ever recorded, and therefore Rule 37(e) does not apply. MFS Opp. at 10–12. It appears to the Court that Lacoste raises two categories of radio transmissions that are at issue here. First, are tactical frequency transmissions used by the SRT members at the September 8 Protest. Second, is a broader category of any radio broadcasts made by LASD deputies throughout the September 8 Protest.

The first category is the most relevant to Plaintiff's claims. In essence, Lacoste argues that during the September 8 Protest, deputies would have used radio transmissions to identify themselves and narrate their actions, thereby allowing her to identify the deputies who used force against her and arrested her. Based upon Lacoste's own allegations and the facts before the Court, however, the deputies "responsible" for her shooting and arrest would have been members of the SRT. Sergeant Muller testified that at the September 8 Protest, all SRT deputies used radio communications on a "tactical frequency" that was separate from the "station's frequency." He further testified that the tactical frequencies would not have been recorded, nor transmitted to the SCC. Thus, the Court cannot conclude that Defendants had a duty to preserve a recording that never existed in the first instance. The party moving for sanctions bears the burden of proving that the ESI existed, and here Plaintiff has not carried her burden of showing that the SRT tactical frequencies were recorded, and thus electronically stored. *See Burris v. JPMorgan Chase & Co.*, 566 F. Supp. 3d 995, 1012 (D. Az. 2021) ("A party seeking

sanctions under Rule 37(e) has a threshold duty to show that the ESI at issue was, in fact, lost or destroyed.").

Existence of the second category, pertaining to any radio broadcasts made by LASD deputies throughout the protest, presents a closer question. Plaintiff relies on three pieces of evidence. First, Plaintiff relies on the Barham Declaration. The Court gives little evidentiary weight to the Barham Declaration for a number of reasons. Barham worked for LASD approximately 45 years ago and does not identify the policies or procedures he relies on to make his assertions. Moreover, it is unclear whether any of his assertions about what he would have expected to see from LASD are applicable to the circumstances here, i.e., a specialized mass protest operation in 2020. Second, Plaintiff relies on a declaration submitted by her counsel. *See* Declaration of Donald Cook ISO MFS Reply [Doc. # 134-1]. Cook attests that he represents a different client who was bit by a LASD police dog on February 22, 2023. *Id.* at ¶ 2. For about a year, the County claimed no recorded radio transmissions regarding the incident existed, but eventually the County produced recorded transmissions from the main channel used by SLA Station and a tactical channel. *Id.* at ¶ 3. Lacoste argues that this shows it is likely there were recorded radio transmissions in her case. MFS Reply at 6. While these facts may show that tactical channels are sometimes recorded, the February 22, 2023 incident sheds little light on what channels were recorded during the September 8 Protest. First, the incidents happened three years apart, and second, it is not apparent that the February 22, 2023 dog bite incident occurred during a protest operation, as opposed to during day-to-day operations.

Lastly, Plaintiff contends Defendants' "unsupported speculation that maybe there were *no* transmissions with LASD dispatch or where field units needed to use a repeater . . . is patently not credible." MFS Reply at 6. The Court is inclined to agree with that notion. Defendants do not dispute that there were approximately 100 LASD deputies deployed to assist with the September 8 Protest. Among those 100 deputies, not all were SRT members. *See* Flynn Decl. ISO MFS, Ex. J [Doc. # 124-12]. A massive

operation, such as this, would surely have involved *some* radio communications broadcasted through a repeater. "A repeater rebroadcasts a radio transmission so that it can be heard over a wider area and, where applicable, transmitted back to a communications center. If a radio transmission is made through a repeater and reaches SCC's recording system, it would ordinarily be recorded by SCC." Morreale Decl. at ¶ 10. It would belie common sense to believe that there was not a single radio transmission broadcasted by a repeater during the entirety of a multi-hour protest. Plaintiff has at least raised serious questions that *some* radio recordings from the September 8 Protest likely once existed.

Even so, there is a fatal gap between the existence of any radio recordings at all, and the existence of radio recordings that "likely would have identified the deputies responsible" for shooting Plaintiff with less-lethal munitions and arresting her. Based on the record, the deputies who used less lethal force and arrested Plaintiff were members of the SRT, the SRT used tactical frequencies to communicate with one another, and those tactical frequencies were not recorded. *See* Muller Depo. at 67:20–68:24, 153:22–154:2, 154:19-23; Bergner Report. That there were other non-SRT deputies in the field who may have used radio frequencies that were recorded, does not help Plaintiff identify who shot her and arrested her. *See Reinsdorf v. Sketchers U.S.A., Inc.*, 296 F.R.D. 604, 631 (C.D. Cal. 2013) ("The deletion of irrelevant evidence does not support a spoliation claim."). The Court finds that there is insufficient evidence to show by a preponderance of evidence that the radio transmissions Plaintiff seeks ever existed in a recorded format. "Mere speculation that other deleted documents may exist that might be helpful to a party's case is also an insufficient basis for a finding of spoliation." *Id.*

Accordingly, the Court **DENIES** Plaintiff's MFS.

**B. Defendants' MSJ**

Under 42 U.S.C. section 1983, a plaintiff may bring a civil action for the deprivation of constitutional rights by an individual acting under color of state law. 42 U.S.C. § 1983; *see Lindke v. Freed*, 601 U.S. 187, 194–95 (2024). The two essential

elements of a Section 1983 claim are that the defendant acted under color of law, and his conduct deprived the plaintiff of a constitutional right. *Stein v. Ryan*, 662 F.3d 1114, 1118 (9th Cir. 2011). Even when a constitutional violation has occurred, however, state officers are entitled to qualified immunity from a Section 1983 action unless the unlawfulness of their conduct was "clearly established" at the time. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). To determine whether officers are entitled to qualified immunity, the Court must answer two separate questions: (1) whether the officers violated a federal statutory or constitutional right, and (2) whether the unlawfulness of their conduct was "clearly established" at the time. *Id.* at 62–63.

As a threshold matter, Defendants contend that all the Individual Defendants are entitled to summary judgment because Lacoste fails to show that each defendant personally participated in, or integrally participated in, any alleged constitutional violation. DMSJ at 16–17. Indeed, Lacoste admits that she "does not believe that each and every Deputy defendant committed all the wrongful acts of which she complains." CSAC at ¶ 12. Since it is undisputed that each Individual Defendant acted under color of state law during the incidents giving to this case, the Court will assess each claim as follows: (1) determine which Deputy Defendant(s) personally or integrally participated in the alleged constitutional violation; (2) determine whether the relevant Defendants' conduct deprived Lacoste of a constitutional right; and (3) where applicable, determine whether qualified immunity applies. The Court separately assesses Lacoste's claims against former Sheriff Villanueva. Lastly, the Court assesses the *Monell* claims, Takings Clause claim (Claim Three), and Privacy Protection Act Claim (Claim Five) against the Entity Defendants.

**1. Fourth Amendment: Unreasonable Seizure of Person (Claim One)**

Lacoste alleges Defendants subjected her to an unreasonable seizure under the Fourth Amendment by: (1) arresting her without probable cause; (2) using excessive

force; and (3) prolonging her detention.[15] CSAC at ¶ 79. The Court addresses each theory in turn.

**a. Unlawful Arrest Claim**

**1) Individual Participant / Integral Participant**

The Court first addresses the issue of *who* participated in Lacoste's arrest. "In order for a person action under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no *respondeat superior* liability under section 1983." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). A plaintiff cannot "hold an officer liable because of his membership in a group without a showing of individual participation in the unlawful conduct." *Id.* at 935 (citing *Chuman v. Wright*, 76 F.3d 292, 293 (9th Cir. 1996)). In the Ninth Circuit, "an official whose 'individual actions' do not themselves rise to the level of a constitutional violation' may be held liable under section 1983 only if the official is an 'integral participant' in the unlawful act." *Peck v. Montoya*, 51 F.4th 877, 889 (9th Cir. 2022) (citation omitted). The Ninth Circuit has not yet defined "the minimum level of involvement for liability under the integral-participant doctrine." *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020). But integral participation "does require some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007). Thus, mere presence as a bystander is insufficient. *Reynaga Hernandez*, 969 F.3d at 941; *Chuman*, 76 F.3d at 294.

**a) SRT Line Deputies**

The Court begins with the SRT line deputies who were present at the protest: Defendants Deboom, Escobedo, Hurtado, Ramirez, Zagurski, Okamoto, and Ruiz.

---

[15] Although Plaintiff did not clearly list prolonged detention under her first cause of action, the CSAC provides sufficient notice to Defendants that her allegations include prolonged detention of her person. *See* CSAC at ¶¶ 50–65. *See Pac. Coast Fed'n of Fishermen's Ass'n v. Glaser*, 945 F.3d 1076, 1087 (9th Cir. 2019) (concluding that courts may consider various theories of liability at summary judgment so long as the facts are sufficiently pled to give defendant fair notice of the claim).

Defendants presented evidence that none of these deputies personally made, or assisted in making, any arrests during the September 8, 2020 Protest. *See* DSUF at ¶ 47 (listing declaration pin cites). The burden shifts to Lacoste to show a triable issue of fact as to their participation in the alleged unlawful arrest. Lacoste argues that since she "was shot with less lethal munitions and then immediately arrested . . . a reasonable inference is that it was one or more of the deputies acting at Sgt. Bergner['s] direction who shot and arrested [her]." [Doc. # 133-1 at ¶ 47.] The only evidence Lacoste cites to support her argument is Sergeant Bergner's September 8, 2020 Report, which lists all of the SRT deputies who reported using less lethal force at the protest. *See* Bergner Report. The Bergner Report does not identify, however, which SRT deputies, if any, effectuated arrests during the protest. Thus, the Bergner Report does not controvert Defendants' evidence—i.e., the sworn declarations of Deboom, Escobedo, Hurtado, Ramirez, Zagurski, Okamoto, and Ruiz—that they did not effectuate, or assist in effectuating, any arrests at the protest. In the absence of any genuine dispute of material fact regarding their involvement, the Court **GRANTS** Defendants' MSJ as to Lacoste's Fourth Amendment unlawful arrest claim against Defendants Deboom, Escobedo, Hurtado, Ramirez, Zagurski, Okamoto, and Ruiz.

**b) SRT Supervisors**

Next, Lacoste contends that Lieutenant McDaniel, Sergeant Bergner, and Sergeant Muller are liable for her arrest because they were on-scene SRT supervisors at the September 8 Protest. DMSJ Opp. at 6. "A supervisory official is liable under § 1983 so long as 'there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018) (quoting *Keates v. Koile*, 883 F.3d 1228, 1242–43 (9th Cir. 2018)). "'The requisite causal connection can be established . . . by setting in motion a series of acts by others or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to

inflict a constitutional injury.'" *Id.* (quoting *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011)). Therefore, "a supervisor may 'be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others.'" *Id.* (quoting *Keates*, 883 F.3d at 1243).

It is undisputed that Lieutenant McDaniel was present at the September 8, 2020 Protest and that he directly supervised and commanded SRT squads outside of the SLA Station. From this fact alone, Lacoste contends Lieutenant McDaniel is liable for her unlawful arrest. Lacoste points to no evidence, however, of Lieutenant McDaniel's personal involvement in making arrests, or any causal connection between actions that he took and her arrest. Lieutenant McDaniel's mere presence as a supervisor on scene, without any additional facts, does not give rise to a reasonable inference of liability. As for Sergeant Bergner, Lacoste argues that since he had "immediate responsibility for the *only* SRT deputies who allegedly fired less lethals," she is "entitled to the inference that Sgt. Bergner approved of his deputies shooting and arresting her." DMSJ Opp. at 6–7. The Court disagrees. Lacoste fails to point to any evidence that Sergeant Bergner's supervision over the SRT deputies who fired less lethal munitions is causally connected in any way to the arrest of protesters. In other words, the fact that Sergeant Bergner oversaw deputies' *use of less lethal force* at the protest, does not raise a triable issue of fact as to his participation in making or directing *arrests*. Indeed, the Court already has determined that Lacoste has not raised a triable issue of fact that any of the SRT line deputies under Sergeant Bergner's direct supervision participated in her arrest. Furthermore, it is undisputed that Sergeant Bergner did not personally detain or arrest any protesters himself on September 8, 2020. Accordingly, the Court **GRANTS** Defendants' MSJ as to Lacoste's Fourth Amendment unlawful arrest claim against Defendants McDaniel and Bergner.

//

Lacoste has raised a triable issue of fact, however, as to Sergeant Muller's involvement in her arrest. It is undisputed that as the SRT Platoon Sergeant, Muller declared an unlawful assembly and issued a dispersal order. Evidence in the record shows that Sergeant Muller continued to repeat dispersal orders, directed the crowds' movements, and followed the crowd by foot. In his deposition, Sergeant Muller testified that after seeing part of the crowd go eastbound on 110th St., he instructed a SRT driver to act as a blocking force on 110th St. for the purpose of making arrests even though people like Lacoste were peacefully dispersing in that direction. When asked if he knew who made the decision to effectuate arrests, Sergeant Muller stated, "I think that defaults on the decision to declare unlawful assembly and disburse [sic] the area, and when they failed to do that, that's a defaulted decision to make arrests when they don't leave." Muller Depo. at 70:17–24. Viewing the evidence in the light most favorable to Lacoste, a reasonable jury could find that Sergeant Muller set in motion the circumstances that led to Lacoste's alleged unlawful arrest. A sufficient causal connection exists between Sergeant Muller's decision to declare an unlawful assembly, efforts to block protesters on 110th St. to arrest them, and Lacoste's alleged unlawful arrest.

**c) Munoz, Meza, and Do**

The Court turns to the final remaining Deputy Defendants who were not SRT members, but instead at the SLA Station during the protest: Sergeant Munoz, Sergeant Meza, and Deputy Do. Starting with Sergeant Munoz, Lacoste makes no attempt to argue or to cite to any evidence that he was involved in Lacoste's arrest. *See generally* DMSJ Opp. Moreover, the Court finds no evidence in the record suggesting that Sergeant Munoz was involved in any aspect of processing the arrestees, let alone effectuating the arrests. Therefore, the Court **GRANTS** Defendants' MSJ as to Lacoste's Fourth Amendment unlawful arrest claim against Defendant Munoz.

Sergeant Meza and Deputy Do worked at SLA Station on September 8, 2020, and did not participate in crowd-control operations. Lacoste argues that Meza and Do are liable for Lacoste's arrest under a Section 1983 civil conspiracy theory. *See* DMSJ Opp.

at 7. Specifically, Lacoste contends Sergeant Meza "is liable because as the South LA Station watch commander . . . he approved Deputy Lizarraga's incident report . . . that falsely listed Deputy Lizarraga as the deputy who could testify to the wrongful acts by the 17 arrestees, when in fact Lizarraga had no such knowledge." *Id.* Lacoste argues Deputy Do is liable under civil conspiracy because she "fabricated" Lacoste's booking report by falsely claiming she arrested Lacoste and refused to identify who directed her to make the false claim. *Id.* Lacoste's arguments are unavailing. "To establish liability for a conspiracy in a § 1983 case, a plaintiff must 'demonstrate the existence of an agreement or meeting of the minds' to violate constitutional rights." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (quoting *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999)). Although the agreement need not be overt, each participant "must at least share the common objective of the conspiracy." *Id.* (quoting *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1538, 1541 (9th Cir. 1989) (*en banc*)). Lacoste fails to point to any evidence in the record that there was an agreement or meeting of the minds between Sergeant Meza and Deputy Do.[16] More fundamentally, there is no evidence that Sergeant Meza and/or Deputy Do shared a common objective with the deputies who effectuated the allegedly unlawful arrests in the field. Lacoste fails to present specific facts showing a genuine dispute of fact as to the existence of a conspiracy. Accordingly, the Court **GRANTS** Defendants' MSJ as to Lacoste's Fourth Amendment unlawful arrest claim against Defendants Meza and Do.

In sum, Defendant Muller is the only Deputy Defendant for whom there is a triable issue of fact that he participated in Lacoste's alleged unlawful arrest.

**2) Probable Cause to Arrest**

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. The "constitutionality of a warrantless arrest is determined by

[16] At the hearing, Plaintiff's counsel asserted that Sergeant Meza approved the document where Deputy Do listed herself as the arresting officer. The LASD Booking and Property Report does not, however, show Sergeant Meza's signature. *See* Defendants' Compendium of Exhibits ISO DMSJ, Ex. 9 [Doc. # 123-2.]

the existence of probable cause." *Barry v. Fowler*, 902 F.2d 770, 772 (9th Cir. 1990). "Probable cause for a warrantless arrest arises when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe 'that the suspect has committed, is committing, or is about to commit a crime.'" *Id.* at 773 (citation omitted). Courts look to "'the totality of circumstances known to the arresting officers, [to determine if] a prudent person would have concluded there was a fair probability that [the defendant] had committed a crime.'" *Crowe*, 608 F.3d at 432 (citation omitted). "Because probable cause is an objective standard, an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." *Wesby*, 583 U.S. at 54 n.2. In the Ninth Circuit, the burden of proof in Section 1983 cases remains with the plaintiff, but a burden-shifting approach applies once the plaintiff makes a *prima facie* case "simply by showing that the arrest was conducted without a valid warrant." *Dubner v. City and Cnty. of San Francisco*, 266 F.3d 959, 965 (9th Cir. 2001). If the plaintiff shows that the arrest was conducted without a warrant, "the burden shifts to the defendant to provide some evidence that the arresting officers had probable cause for a warrantless arrest." *Id.* While the plaintiff carries the ultimate burden of proof, the burden of production falls on the defendant. *Id.*

There is no dispute that Lacoste was arrested without a warrant. Thus, the question is whether Defendants have shown that there is no genuine dispute of material fact that there was probable cause to arrest Lacoste for violating California Penal Code section 409 ("Section 409").[17] Section 409 provides that "[e]very person remaining present at the place of any riot, rout, or unlawful assembly, after the same has been lawfully warned to disperse, except public officers and persons assisting them in attempting to disperse the same, is guilty of a misdemeanor." Cal. Pen. Code § 409. California Penal Code section 407 defines an "unlawful assembly" as "[w]henever two or more persons assemble together to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous

---

[17] It is undisputed that California Penal Code section 409 is the only possible crime for which Lacoste could have been arrested.

manner[.]" Cal. Pen. Code § 407. In a Section 1983 action, the existence of probable cause is generally a question of fact to be resolved by the jury "and summary judgment is appropriate only if no reasonable jury could find that the officers did or did not have probable cause to arrest." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984).

Looking at the evidence in the light most favorable to Lacoste, there are triable issues of fact regarding whether there was probable cause to arrest her. First, there are material disputes of fact about whether Lacoste remained present "at the place of" an unlawful assembly. Sergeant Muller declared an unlawful assembly at the intersection of Imperial Hwy. and Normandie Ave. and instructed the crowd to leave "the area." Sergeant Muller testified that leaving "the area" meant going northbound, westbound, or eastbound to their cars, homes, etc. In an effort to disperse the crowd, SRT directed protesters to move northbound on Normandie Ave. Lacoste ran northbound on Normandie Ave. before eventually turning east onto 110th St. Defendants contend "the arresting officers had probable cause because [Lacoste] remained with the crowd after the dispersal orders" when she "moved with the crowd northbound on Normandie Ave., and was arrested near 1234 W. 110th Street shortly after separating from the crowd." DMSJ at 22. A reasonable jury viewing the same facts could disagree with Defendants' characterization and find that she was following SRT's own instructions to move northbound on Normandie Ave. A reasonable jury could also find that by turning onto 110th St., Lacoste *did not* remain with the crowd and was attempting to leave the area to go towards her parked car.

Second, based on Lacoste's perception of the situation on 110th St., there was no disorderly or violent conduct occurring at that location, certainly not on her part. She felt sufficiently secure that she stopped running while on that street. A jury could reasonably find that there was no probable cause to arrest peaceful protesters, let alone a journalist documenting the event, who were merely trying to comply with the dispersal orders.

Third, there is conflicting evidence between Sergeant Muller and Sergeant Bergner's own views of what compliance with the dispersal order meant. While Sergeant

Muller testified that individuals on 110th St. had not sufficiently complied with the dispersal order, Sergeant Bergner testified that proper dispersal could involve going down a side street to get to one's car. *See* Bergner Depo. at 65:8–21. The Court is not able to weigh conflicting evidence and make credibility determinations at summary judgment—that remains for the jury. A reasonable jury could certainly infer from Sergeant Bergner's testimony that Lacoste had not failed to disperse.

Fourth, the parties fiercely dispute the time of Lacoste's arrest: Defendants assert her time of arrest was 9:20 p.m., while Lacoste claims she was arrested around 8:40 p.m. Defendants argue that under either time, probable cause is undefeated because Lacoste "had remained in the dispersal area after the unlawful assembly was declared and dispersal orders were issued." DMSJ Reply at 17. The Court disagrees. Lacoste was arrested approximately half a mile away from the intersection of Imperial Hwy. and Normandie Ave., where Sergeant Muller issued the initial dispersal orders to leave "the area" by 8:25 p.m. Whether Lacoste was at 1234 West 110th St. at 8:40 p.m. versus 9:20 p.m. is a material fact that goes to the totality of circumstances known to the officers about whether Lacoste was in violation of Section 409. A reasonable jury could find that it did not take Lacoste over an hour to turn east onto 110th St. after Sergeant Muller issued the initial dispersal orders.

Therefore, Lacoste raises triable issues of fact as to whether there was probable cause for her arrest.

**3) Qualified Immunity: Sergeant Muller**

Next, the Court addresses whether Sergeant Muller is entitled to qualified immunity. Lacoste bears the burden of demonstrating that "the rights allegedly violated were clearly established." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017), *cert. denied sub nom. Shafer v. Padilla*, 584 U.S. 1002 (2018). Demonstrating that the unlawfulness of an officer's actions was "clearly established" requires a showing that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."

*Wesby*, 583 U.S. at 63; *Hardwick v. Cnty. of Orange*, 844 F.3d 1112, 1118 (9th Cir. 2017).

At the time of Lacoste's arrest, "it was clearly established that every arrest 'is unreasonable unless it is supported by probable cause.'" *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1024 (9th Cir. 2009) (quoting *Michigan v. Summers*, 452 U.S. 692, 700 (1981)). "Because the standard for probable cause is well settled, the question with respect to whether an unlawful arrest violated clearly established law is 'whether it is *reasonably arguable* that there was probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity.'" *Sialoi v. City of San Diego*, 823 F.3d 1223, 1233 (9th Cir. 2016) (quoting *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011)). The Ninth Circuit acknowledges that the "existence of probable cause necessarily turns upon the particular facts of the individual case, and prior decisions generally are of little help in deciding a specific case." *Ramirez*, 560 F.3d at 1024 (internal quotation marks and citation omitted).

Here, there are triable issues of fact as to whether it is "reasonably arguable" that there was probable cause for Lacoste's arrest because there is a material dispute of fact as to whether the people who turned onto 110th St. were in fact dispersing. The primary evidence Defendants rely upon is Sergeant Muller's *subjective* assessment that the people who turned onto 110th St. had failed to disperse. Sergeant Muller testified that he instructed SRT to be a blocking force on 110th St. for the purpose of making arrests for failure to disperse. According to both Sergeant Muller and Sergeant Bergner, however, the primary goal for dispersal was for people to leave the area, which included going in any direction— toward their homes, cars, etc.—so long as people did not try to go behind the SRT squad (i.e., back toward the SLA Station). Indeed, there is no evidence in the record to suggest that SRT specifically told protesters *not* to leave by going down a side street. Additionally, Defendants do not point to evidence, for example, showing that the people who turned onto 110th St. congregated and refused to move, therefore

necessitating arrests. And it is undisputed that the last threat of violence and use of force occurred at the *intersection* of 110th St. and Normandie Ave. Once Lacoste turned onto 110th St., she stopped running because she "saw other people walking and behaving normally" and continued walking away from the intersection, towards her car. A reasonable jury viewing all of this evidence could conclude that it was not even "reasonably arguable" that probable cause existed to arrest Lacoste because she was actively dispersing before she was blocked by SRT and arrested.

Based on the disputed issues of material fact, the Court concludes summary judgment on qualified immunity grounds is inappropriate here. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) ("Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is 'a question of fact best resolved by a jury,' . . . only in the absence of material disputes is it 'a pure question of law.'"). The Court therefore **DENIES** Defendants' MSJ as to Plaintiff's Fourth Amendment unlawful arrest claim against Defendant Muller.

**b. Excessive Force Claim**

**1) Individual Participant / Integral Participant**

**a) SRT Line Deputies**

With regard to the excessive force claim, the Court begins again with the SRT line deputies who were present at the protest: Defendants Deboom, Escobedo, Hurtado, Ramirez, Zagurski, Okamoto, and Ruiz. Sergeant Bergner's Report identifies each of these Defendants as SRT deputies who reported using force at the September 8 Protest. Defendants also presented declarations from each of these SRT deputies, attesting that: (1) Sergeant Bergner's Report accurately captures the locations at which they deployed munitions, and (2) they did not deploy munitions at the location where Lacoste was struck.[18] Plaintiff does not proffer evidence disputing the accuracy of Bergner's Report

[18] *See* Deboom Decl. at ¶ 7; Declaration of Aaron Escobedo at ¶ 8; Declaration of Jose Hurtado at ¶ 8; Declaration of Jose Ramirez at ¶ 7; Declaration of Robert Okamoto at ¶ 8; Declaration of Adrian Ruiz at ¶ 8 [Doc. # 123-2].

and she acknowledges that "these defendants put themselves [at] a different location . . . than the location where [she] was actually shot[.]" DMSJ Opp. at 7. Instead, relying on Sergeant Bergner's Report, Lacoste contends that since she "was shot, then it was one or more of the deputies Sgt. Bergner's report identifies who shot [her]." *Id.*

Lacoste's argument amounts to a theory of group liability that is foreclosed by *Jones* and *Chuman*. *See Jones*, 297 F.3d at 935 ("[A] plaintiff could not hold an officer liable because of his membership in a group without a showing of individual participation in the unlawful conduct."). Lacoste must do "more than simply place the officers at the scene of the altercation and assert a group liability theory." *See Lolli v. Cnty. of Orange*, 351 F.3d 410, 417 (9th Cir. 2003). In *Lolli v. Cnty. of Orange*, Lolli filed an excessive force claim against seven deputies after they beat him for several minutes in a holding cell. *Id.* at 415–16. Lolli testified that he was taken to the ground by one deputy, and then six other deputies surrounded him and "kicked him, punched him, hit him with batons or similar objects, twisted his arms and legs, poked his face, knuckled his ear and pepper sprayed him." *Id.* at 412. The Ninth Circuit determined that "[e]ven though Lolli has not been able to identify precisely which officer delivered which alleged blow or use of force, he has developed and presented sufficient evidence from which a jury could infer that the individual officers who had physical contact with Lolli participated in the alleged beating." *Id.* at 417. Critically, Lolli did more than just place the officers at the scene—he "properly relied on the deputies' own admissions that they were involved in the altercation and that they exerted some physical force on him to create the necessary inference that the deputies were 'integral participants in the alleged unlawful act.'" *Id.* (quoting *Jones*, 297 F.3d at 936).

Here, Lacoste has not presented any evidence that creates a genuine dispute of fact that Deputies Deboom, Escobedo, Hurtado, Ramirez, Zagurski, Okamoto, or Ruiz are liable for using force against her. There is no evidence in the record disputing these deputies' attestations that they did not deploy munitions at the location where Lacoste was struck. Lacoste asks the Court to draw an inference that since these deputies "were

the *only* SRT deputies who discharged less lethals since LASD procedure would have required others to have reported that fact," they are liable for shooting her. DMSJ Opp. at 7. But Lacoste does not grapple with the fact that the SRT line deputies named as defendants in this case were *not* the only deputies who identified themselves as deploying less lethal munitions in the Bergner Report. The Court sees nine other LASD deputies' names who reported using force during the protest.[19] Without offering any evidence or argument to distinguish these non-defendant deputies from the named Deputy Defendants, Lacoste asks for much more than a reasonable inference. Plaintiffs' scatter-shot approach is no substitute for evidence. Absent a genuine dispute of material fact that the SRT line deputies directly participated in or were integral participants in her alleged constitutional injury, the Court **GRANTS** Defendants' MSJ as to Lacoste's Fourth Amendment excessive force claim against Defendants Deboom, Escobedo, Hurtado, Ramirez, Zagurski, Okamoto, and Ruiz.

**b) Munoz, Meza, Do**

As for Sergeant Munoz, Sergeant Meza, and Deputy Do, Lacoste points to no evidence in the record suggesting that they were even remotely involved in the alleged use of force against her. *See generally* DMSJ Opp. Therefore, the Court **GRANTS** Defendants' MSJ as to Lacoste's Fourth Amendment excessive force claim against Defendants Munoz, Meza, and Do.

**c) SRT Supervisors**

Lacoste argues that Lieutenant McDaniel, Sergeant Bergner, and Sergeant Muller are liable under her excessive force claim because they were on-scene SRT supervisors at the September 8 Protest. DMSJ Opp. at 6. As with the unlawful arrest claim, the mere fact that Lieutenant McDaniel was present on scene at the September 8 Protest as a supervisor, does not establish his "personal involvement" or a "sufficient causal

---

[19] The names of those deputies are Duke Sanders, Lauren Britt, Garrett Rifkin, Kirsten Aufdemberg, John Balarosan, Kevin Cater, Gabriel Sanchez, Sean Whiteman, and Andrew Muller. *See* Bergner Report.

connection" between his conduct and the use of force against Lacoste. *See Rodriguez*, 891 F.3d at 798. Lacoste fails to identify any specific conduct by Lieutenant McDaniel that could show a plausible connection to her alleged constitutional injury. The same is true of Sergeant Muller. Although there are triable issues of fact as to whether Sergeant Muller set in motion her unlawful arrest, Lacoste does not point to any evidence creating a triable issue of fact that Sergeant Muller is causally connected to the *manner* in which she was arrested (i.e., the amount of force used against her while she was being arrested). For example, there is nothing in the record to suggest Sergeant Muller saw Lacoste being arrested and failed to intervene when he saw how the arrest was effectuated. Furthermore, Lacoste raises no triable issue of fact that Sergeant Muller was involved in directing the SRT's use of force (i.e., deploying less lethal weapons). Accordingly, the Court **GRANTS** Defendants' MSJ as to Lacoste's Fourth Amendment excessive force claim against Defendants McDaniel and Muller.

Lacoste does raise triable issues of fact, however, as to Sergeant Bergner's connection to her excessive force claim. Drawing all reasonable inferences in favor of Lacoste, a reasonable jury could find that Lacoste was shot by less lethal munitions deployed by an LASD deputy, since there is no evidence in the record suggesting that other agencies or individuals were on scene shooting such munitions. Although Sergeant Bergner did not personally deploy any less lethal munitions, he directly gave commands on when to use force and oversaw the SRT deputies who exercised that force on individuals on 110th Street. Given Lacoste's description of the situation on 110th Street and the fact that she was wearing a press badge and not engaging in any disorderly conduct, a reasonable inference can be drawn that any amount of force ordered to be unleashed on her as she attempted to comply with dispersal orders was excessive. A reasonable jury could find that Sergeant Bergner's involvement establishes a "sufficient causal connection" to the alleged excessive force, limited to Plaintiff's allegation that she was shot with less lethal munitions. *See Rodriguez*, 891 F.3d at 798 (finding supervising

sergeants liable where they were personally present and directed the deputies' use of force).

In sum, Defendant Bergner is the only Deputy Defendant for whom there is a triable issue of fact that he was involved in the shooting of Lacoste with less lethal munitions.

**2) Excessive Force: Sergeant Bergner**

A threshold question in a Fourth Amendment excessive force claim is whether there was a "seizure" within the meaning of the Fourth Amendment. Not "every physical contact between a government employee and a member of the public" is a seizure under the Fourth Amendment. *Torres v. Madrid*, 592 U.S. 306, 317 (2021). Rather, "[a] seizure requires the use of force *with intent to restrain*." *Id.* "[T]he appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain." *Id.* The Ninth Circuit has held that where an officer "intentionally used physical force by directing a foam baton round" at a protester, "a reasonable factfinder could determine that he was seized within the meaning of the Fourth Amendment." *Sanderlin v. Dwyer*, 116 F.4th 905, 912 (9th Cir. 2024). The fact that the officer stated "his actual intent in firing the foam baton was to force him to leave the area, not to restrain . . . or apprehend him" did not change the analysis. *Id.* at 912–13; *see also Nelson v. City of Davis*, 685 F.3d 867, 877 (9th Cir. 2012) (rejecting argument that officers' actions could not constitute a seizure because their intent in shooting pepperballs was to disperse a crowd). Here, a reasonable factfinder could conclude that Lacoste was seized within the meaning of the Fourth Amendment when she was struck by less lethal munitions.

Courts analyze excessive force claims under the Fourth Amendment's "objective reasonableness" standard. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1090 (9th Cir. 2013) (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)). The reasonableness determination "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks and citation

omitted). Courts in the Ninth Circuit employ a three-step analysis in evaluating excessive force claims. The first step is to assess the severity of the intrusion on the plaintiff's Fourth Amendment rights based on the type and amount of force inflicted. Next, a court must evaluate the government's interests in light of the three *Graham* factors: (1) the severity of the crime; (2) the threat posed to officers or bystanders; and (3) any resistance to arrest and risk of flight. Finally, a court must balance the gravity of the intrusion on the plaintiff against the government's need for the intrusion. *Espinosa v. City and Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010); *see also Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003). The Ninth Circuit has held that "[b]ecause the reasonableness standard 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, . . . summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'" *Torres*, 648 F.3d at 1125 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). "This is because such cases almost always turn on a jury's credibility determinations." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (*en banc*).

The Court finds that there are genuine disputes of material fact regarding the "objective reasonableness" of the force used, such that summary judgment in favor of Sergeant Bergner is inappropriate. First, a reasonable jury could find that the intrusion on Lacoste's Fourth Amendment rights was severe. She claims she was struck by munitions on three parts of her body: (1) on the side of her head, knocking off the helmet she wore for safety, (2) on her hand, causing bleeding and requiring stitches, and (3) on the back of her shoulder, causing bruising. A reasonable jury could find that this use of force was disproportionate in light of the *Graham* factors, given that the only possible crime committed, if at all, was for a minor offense of failing to disperse, Lacoste posed no danger or threat during the September 8 Protest, and there is no evidence that Lacoste attempted to flee or resist arrest.

Viewing the evidence in a light most favorable to Lacoste, a reasonable jury could conclude that the use of force against her was unreasonable.

**3) Qualified Immunity: Sergeant Bergner**

The Court turns next to whether Sergeant Bergner is entitled to qualified immunity against Lacoste's Fourth Amendment excessive force claim.[20] A clearly established right cannot merely be implied by precedent, and plaintiffs may not defeat qualified immunity by describing violations of clearly established general or abstract rights outside "an obvious case." *White v. Pauly*, 580 U.S. 73, 80 (2017) (quoting *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004)); *see also Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality"); *Est. of Najera Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) (citations omitted) (in an "obvious case," the *Graham* factors can "clearly establish" a constitutional violation "even without a body of relevant case law"). The Ninth Circuit has emphasized that "it is the facts of particular cases that clearly establish what the law is." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 951 (9th Cir. 2017).

Lacoste cites to *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012), as law "clearly establishing that firing less lethal rounds at non-threatening and non-resisting protest attendees violates the Fourth Amendment." DMSJ Opp. at 8. In *Nelson*, the plaintiff was a student at the University of California at Davis ("U.C. Davis") when he suffered a permanent eye injury after a U.C. Davis police officer shot him in the eye with a pepperball projectile.[21] 685 F.3d at 872. Police responded to an apartment complex where approximately 1,000 people gathered for a party. *Id.* at 872. The officers gathered in a "very narrow and confined space" in front of a breezeway in the apartment complex where a group of about 15 to 20 people, including Nelson, congregated. *Id.* at 873–74. Students attempted to leave the party, but police "blocked their means of egress and did

---

[20] Sergeant Bergner's conduct is only causally connected to the excessive force claim insofar as Lacoste was struck by less lethal munitions, therefore the Court limits its analysis accordingly.

[21] "Pepperball guns are, in essence, paintball guns that fire rounds containing oleoresin capsicum ("OC") powder, also known as pepper spray." *Id.* at 873.

not provide any instructions for departing from the complex." *Id.* at 874. Students testified that they were awaiting instructions from the police. *Id.* The officers claimed they warned congregants to disperse, and when they failed to disperse a sergeant ordered his team to "disperse them," at which point three officers shot pepperballs at Nelson's group from approximately 45 to 150 feet away. *Id.* The students claimed they did not hear any commands to disperse until after shots were already fired. *Id.* A pepperball launched from one of the officers' guns hit Nelson in the eye, causing him to immediately collapse. *Id.* After concluding that the use of force constituted a "seizure" within the meaning of the Fourth Amendment and that the force used against Nelson was unreasonable under *Graham*, the Ninth Circuit analyzed whether it was clearly established that the officers' conduct would violate Nelson's Fourth Amendment rights. The Ninth Circuit determined that in light of its holding in *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), "a reasonable officer would have known that firing projectiles, including pepperballs, in the direction of individuals suspected of, at most, minor crimes, who posed no threat to the officers or others, and who engaged in only passive resistance, was unreasonable." *Nelson*, 685 F.3d at 886.

Defendants argue that the circumstances are "materially different" here because the facts involve "a protest-dispersal operation, repeated unlawful-assembly declarations and dispersal orders, [and] an arrest for failure to disperse[.]" DMSJ Reply at 24. Defendants' attempt to split hairs is unavailing. The standard does not "require a case directly on point for a right to be clearly established," so long as "existing precedent" places "the statutory or constitutional questions beyond debate." *Kisela*, 584 U.S. at 104 (quoting *White*, 580 U.S. at 79). The facts in *Nelson* are quite similar to those in this case. Here, as in *Nelson*, Lacoste was attempting to leave the area by turning right onto 110th St. from Normandie Ave. (a route which was not contrary to any dispersal orders); munitions were fired at the command of a sergeant; prior to being shot on 110th St., she did not hear any additional warnings; and she did not pose a threat to the safety of the officers. Even if additional commands to disperse were given, the Ninth Circuit has

"recognized that a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson*, 685 F.3d at 881. *Nelson* is binding precedent that puts a reasonable officer on notice that indiscriminately firing less lethal projectiles in the direction of non-threatening individuals, who at most may have committed a minor misdemeanor, would constitute unreasonable force under the Fourth Amendment. *Nelson* places the constitutional questions implicated in this case beyond debate.

Accordingly, the Court **DENIES** Defendants' MSJ as to Plaintiff's Fourth Amendment excessive force claim against Defendant Bergner.

**c. Prolonged Detention Claim**

Lacoste argues that even if there were probable cause to detain her, she was subjected to an unconstitutional prolonged detention because she was "arrested and jailed for almost nineteen hours for the alleged non-violent offense of failing to disperse" instead of being cited and released in the field "as is ordinarily required under state law and LASD policy." CSAC at ¶ 50. Lacoste cites to California Penal Code section 853.6 ("Section 853.6") to assert that she should have been released on her own recognizance in the field or immediately after booking. *Id.* at ¶ 61. Section 853.6(a)(1) provides in relevant part: "When a person is arrested for an offense declared to be a misdemeanor . . . and does not demand to be taken before a magistrate, that person shall, instead of being taken before a magistrate, be released according to the procedures set forth by this chapter, although nothing prevents an officer from first booking an arrestee pursuant to subdivision (g)." Cal. Pen. Code § 853.6(a)(1). Section 853.6(g) gives the arresting officer discretion to "book the arrested person at the scene or at the arresting agency prior to release." Cal. Pen. Code § 853.6(g). Section 853.6(i) provides that a "person shall be released according to the procedures set forth in this chapter unless" certain exceptions apply, such as the "person arrested required medical examination." Cal. Pen. Code § 853.6(i). Lastly, she points to LASD Policy 5-03/115.00, which provides that

"[m]isdemeanor prisoners shall be released in the field whenever it is reasonable and safe to do so . . . ." CSAC at ¶ 62.

The relevant timeline of events is as follows. After being arrested, Lacoste was transported to SLA Station in handcuffs. She was subsequently transported to UCLA Harbor Medical Center in Torrance to receive medical treatment. After receiving medical treatment, she was returned to the SLA Station where she was told that deputies would transport her to County jail, but the County jail would not admit her because she had a fever. LASD set bail for her release at $5,000 and at around 3:00 p.m. on September 9, 2020, she was released on bond. These facts, even when viewed in the light most favorable to Lacoste, do not support a Fourth Amendment prolonged detention claim.

First, to impose liability under Section 1983, "the plaintiff must prove a violation of a federal statute or the United States Constitution." *Carlo v. City of Chino*, 105 F.3d 493, 497 (9th Cir. 1997); *see also Miller v. City of Scottsdale*, 88 F.4th 800, 805 (9th Cir. 2023) ("Section 1983 actions generally cannot rest on a violation of state law, 'unless the right encompassed in the state statute is guaranteed under the United States Constitution.'"). Lacoste does not have a "*constitutional right* to be released in the field without being booked or posting bail once lawfully arrested." *Higbee v. City of San Diego*, 911 F.2d 377, 380 (9th Cir. 1990). Rather, "[t]he state is constitutionally permitted to detain all misdemeanor arrestees for the usual post-arrest procedures." *Id.* at 379.

Second, even assuming that there was a violation of Section 853.6, Lacoste does not adequately connect that violation to a cognizable Fourth Amendment claim.[22] Lacoste cites to only *Rodriguez v. United States*, 575 U.S. 348 (2015), to assert her detention was unlawfully prolonged under the Fourth Amendment. *See* PMSJ at 13.

[22] Plaintiff does not allege or argue that the Section 853.6 violation caused a deprivation of her Fourteenth Amendment Due Process rights. Therefore, the Court does not analyze her claim under the Fourteenth Amendment.

*Rodriguez* is a seminal case on the doctrine of prolonged detentions in the context of a traffic stop, and its facts are inapposite here. *Rodriguez* addresses a situation where the length of an investigatory stop justified only by reasonable suspicion—not probable cause—exceeds the permissible bounds of the Fourth Amendment. Under Cal. Pen. Code § 853.6(g), arresting officers are allowed to book the arrestee at the agency station, prior to release. Thus, Lacoste's prolonged detention claim rests on the argument that she should have been released right after being booked, rather than held on bail and potentially taken to the County jail. But Lacoste cites no authority applying *Rodriguez* to a post-arrest claim. Moreover, Lacoste cites no authority where a failure to release a misdemeanant under Section 853.6 was analyzed under the Fourth Amendment for prolonged detention. The Court is unaware of any such cases.

Defendants argue that Lacoste's prolonged detention theory fails because she was released within 48 hours of her arrest and identifies no unreasonable delay in her detention. DMSJ Opp. at 17–18. Defendants' analysis falls under the *Gerstein v. Pugh*, 420 U.S. 103 (1975), and *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991), line of cases. "When a person is arrested without the benefit of a warrant supported by probable cause, the Fourth Amendment requires a judicial determination of probable cause to occur 'promptly' after their arrest." *Jones v. City of Santa Monica*, 382 F.3d 1052, 1055 (9th Cir. 2004) (citing *Gerstein*, 420 U.S. at 125). Probable cause determinations "within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *McLaughlin*, 500 U.S. at 56. The Court finds that *Gerstein* and *McLaughlin* are inapplicable here. Notably, Lacoste never characterizes her Fourth Amendment prolonged detention claim as being about the lack of a timely probable cause determination. *See generally* CSAC. Moreover, nowhere in her papers does she mention either *Gerstein* or *McLaughlin*.

The Court determines that Lacoste has not established a cognizable Fourth Amendment prolonged detention theory, as a matter of law. Therefore, the Court

**GRANTS** Defendants' MSJ as to Lacoste's Fourth Amendment prolonged detention claim against all Defendants.

**2. Fourth Amendment: Unreasonable Seizure of Property (Claim Two)**

Lacoste alleges a Fourth and Fourteenth Amendment violation for deprivation of property based on the "initial and continued seizure of Plaintiff's personal property without a warrant or judicial review of any kind." CSAC at ¶ 83.

**a. Individual Participant / Integral Participant**

The Court first addresses whether any of the Deputy Defendants personally participated in the seizure and retention of Lacoste's property. Defendants set forth evidence that none of the Deputy Defendants—McDaniel, Muller, Bergner, DeBoom, Escobedo, Hurtado, Ramirez, Zagurski, Okamoto, Ruiz, Meza, Munoz, and Do—made any decision to, or played any part in, the booking and retention of Lacoste's camera. [*See* Doc. # 133-1 at ¶¶ 48 (string cite of declarations and evidence in support), 52.] Although Lacoste indicates that these facts are disputed, she does not cite to any evidence in the record that creates a material dispute about their participation in the seizure or retention of her property. [*See* Doc. # 133-1 at ¶ 48.][23] Accordingly, the Court **GRANTS** Defendants' MSJ as to Lacoste's Fourth/Fourteenth Amendment deprivation of property claim against Defendants McDaniel, Muller, Bergner, DeBoom, Escobedo, Hurtado, Ramirez, Zagurski, Okamoto, Ruiz, Meza, Munoz, and Do.

**b. Unreasonable Seizure of Property**

The Court turns to the merits of the alleged constitutional violation, which is necessary to assess Lacoste's claims against Defendant Villanueva and the Entity Defendants. Defendants move for summary judgment on Plaintiffs' unlawful property seizure claim under the Fourth Amendment. DMSJ at 22–24. Defendants' MSJ does not address Plaintiff's unreasonable seizure of property claim under the Fourteenth

[23] Plaintiff asserts the facts in paragraph 48 are disputed and refers to her "response to defense fact 47." PSGD at ¶¶ 47–48. Plaintiff's response to paragraph 47 cites to facts pertaining only to the shooting of munitions and her arrest, and not to any facts pertaining to the seizure and retention of her property. *See id.*

Amendment, and therefore the Court does not reach the duplicative claim under the Fourteenth Amendment. *See generally* DMSJ; *see also Graham*, 490 U.S. at 395 (holding that where the Fourth Amendment "provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.").

The Fourth Amendment protects against unreasonable seizures. U.S. Const. amend. IV. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Generally, a seizure of personal property is "*per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983). The general rule is "subject only to a few specifically established and well delineated exceptions." *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001) (internal quotation marks and citation omitted). It is the government's burden to show that the seizure falls under an established exception to the warrant requirement. *Id.*

Additionally, "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *Jacobsen*, 466 U.S. at 124. For example, an "unreasonable delay between the seizure of [property] and obtaining a search warrant" may violate the Fourth Amendment. *United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015). To assess whether a seizure is reasonable, courts "must balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* (quoting *Place*, 462 U.S. at 703). "A seizure is justified under the Fourth Amendment only to the extent that the government's justification holds force." *Brewster v. Beck*, 859 F.3d 1194, 1197 (9th Cir. 2017). If the

justification no longer holds force, "the government must cease the seizure or secure a new justification." *Id.*

Defendants contend that the initial seizure was lawful as a search incident to a lawful arrest, citing *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1477 (9th Cir. 1993). DMSJ at 23. Defendants further assert that the continued retention was reasonable under the totality of circumstances. DMSJ Reply at 19–20.

Even assuming that the initial seizure of Lacoste's property was lawful incident to arrest, the record is rife with triable issues of fact regarding whether LASD's continued retention without a warrant was reasonable. First, viewing the evidence in the light most favorable to Lacoste, a jury could find that the nature of the intrusion here is high. Lacoste is a journalist and photographer, and the property seized by LASD included her professional camera, directly implicating her work and livelihood. In essence, Lacoste was without a critical piece of work equipment for half a year. Defendants argue that "Plaintiff identifies no evidence that she requested return of the camera before March 2021, or that Defendants refused any earlier request for its return." DMSJ Reply at 19. Lacoste has pointed to evidence, however, that she asked for return of her camera upon her initial release from custody, but was denied that request.

Second, there are triable issues of fact regarding the importance of the governmental interests in retaining the property. Defendants contend that retention of the camera was reasonable because it had investigative value insofar as "it could contain evidence concerning Plaintiff's conduct, the dispersal orders, the circumstances of the arrest, and the events surrounding the protest." DMSJ Reply at 19. There are triable issues of fact, however, as to whether LASD ever actually searched the contents of the camera and whether LASD was in fact investigating criminal conduct during the six months it retained the camera. It is undisputed that LASD never obtained a warrant to search the contents of Lacoste's camera, which casts doubt on Defendants' contentions regarding the investigative value of the camera. A jury ought to weigh the strength of

Defendants' justification for retaining the camera against the length of the retention, the absence of a search warrant, and the intrusion on Lacoste's property interests.

Accordingly, there are triable issues of fact as to whether Lacoste's Fourth Amendment right against unreasonable seizures of property was violated.

**3. First Amendment Claim (Claim Four)**

Lacoste asserts a claim under the First Amendment, contending Defendants' conduct of shooting her with less-lethal weapons and arresting her without probable cause while she attended the September 8 protest as a photographer violated her "rights to freedom of speech, assembly, and association." *See* CSAC at ¶¶ 17–20, 90. Defendants move for summary judgment arguing Lacoste's First Amendment theory fails as a matter of law because "the existence of probable cause defeats a First Amendment retaliatory-arrest claim." DMSJ at 24 (citing *Hill v. City of Fountain Valley*, 70 F.4th 507, 518 (9th Cir. 2023). Defendants also argue that Lacoste "identifies no evidence that any Defendant acted with retaliatory motive, targeted her because of protected activity, or caused any First Amendment injury." DMSJ Reply at 21.

Lacoste does not respond to Defendants' arguments regarding her First Amendment Claim. *See generally* DMSJ Opp. "[I]n most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue." *See Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011); *see also Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 (9th Cir. 2005) (finding that the plaintiff "abandoned" the claims she did not raise in opposition to the defendant's motion for summary judgment).

The Court therefore **GRANTS** Defendants' MSJ as to Lacoste's First Amendment claim against all Defendants.

**4. Former Sheriff Villanueva**

Lacoste sues former Sheriff Villanueva in his individual capacity for violating her Fourth, Fourteenth, and First Amendment rights under Claims One, Two, and Four of her

CSAC. CSAC at ¶¶ 78–84. Defendants contend Villanueva is entitled to summary judgment on all claims because Lacoste has not established his personal participation in the alleged constitutional violations, and he would nevertheless be entitled to qualified immunity. Lacoste does not claim that Villanueva personally participated or was an integral participant in the constitutional violations. Indeed, the parties agree that Villanueva did not personally deploy any less-lethal munitions at her, arrest her, or seize her personal property. DSUF at ¶ 52. Nevertheless, Villanueva can be liable as a supervisor "for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

In her Opposition, Plaintiff dedicates a single sentence to defend against summary judgment. In total, she states: "[t]hen Sheriff Villanueva is liable for the violations of Ms. Lacoste's constitutional rights, for reasons Judge Birotte Jr. gave in *Astorga* for the same 9/8/20 protest involving two plaintiffs—Christina Astorga and Hugo Padilla—similar [sic] situated with Ms. Lacoste (all three arrested and shot at the same location, and charged with the same violation—Cal. Penal Code § 409)." DMSJ Opp. at 6. The relevant order Lacoste cites is *Astorga v. Cnty. of Los Angeles*, No. CV 20-09805-AB (AGRx), 2024 WL 3313747 (C.D. Cal. May 28, 2024). Defendants argue that Lacoste identifies no evidence *here* that Villanueva directed or knew of and failed to prevent the violations against *her*. DMSJ Reply at 11. The Court agrees.

The *Astorga* court granted Villanueva qualified immunity as to the plaintiffs' First Amendment claim and Fourth Amendment unlawful seizure of property claim under prong two, i.e., whether there was a clearly established constitutional right at the time of the incident. *Astorga*, 2024 WL 3313747, at *15–16. The *Astorga* court therefore did not reach the issue of whether there were triable issues of fact as to Villanueva's supervisory role for those claims. As for the plaintiffs' excessive force claim, which was premised on the use of less-lethal projectiles, the *Astorga* court did briefly analyze "whether Plaintiffs have offered sufficient support for the contention that Sheriff

Villanueva set in motion a series of acts by others or knowingly refused to terminate a series of acts by others which he knew or reasonably should have known would cause others to inflict the constitutional injury, or failed to act in training, supervising, or controlling his subordinates." *Id.* at *16. *Based on the factual record before it*, the *Astorga* court concluded that: "it is undisputed, or, at the very least, reasonably inferred, that Sheriff Villanueva was aware that LASD's approach to large protest crowds included their use of projectiles, even when it was difficult to target specific individuals, that this approach was used on September 8 and September 25, and that no subordinates were disciplined following the protests. Sheriff Villanueva should have known that empowering his subordinates to, or failing to train or control to the contrary, that dispersing a crowd in the way they did could inflict constitutional injury." *Id.*

Lacoste's cursory reliance on the *Astorga* order is insufficient to establish liability against Villanueva here. "As a general rule, a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it." *M/V Am. Queen v. San Diego Marine Const. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983); *see also GemCap Lending, LLC v. Quarles & Brady, LLP*, 269 F. Supp. 3d 1007, 1020 (C.D. Cal. 2017) ("[W]hile a court may judicially notice the existence of another court's opinion, it cannot 'accept as true the facts found or alleged in such documents.'"). The Court cannot rely on a ruling in another case to supply facts not presented in *this* litigation to defeat a properly supported motion for summary judgment. Lacoste submitted no admissible evidence whatsoever, to create a genuine dispute of fact that Villanueva is liable as a supervisor *in this case*. Even if the Court were allowed to take judicial notice of facts presented in another court's order, the *Astorga* order did not lay out in detail the facts it relied upon to reach its conclusion. It is not the Court's duty to cull the record for facts, let alone in a completely different case. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

//

Summary judgment may be granted where the moving party shows an "absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. In the absence of evidence in the record before this Court, that Villanueva is liable as a supervisor, the Court **GRANTS** Defendant's MSJ on all claims as to Defendant Villanueva.

**5. *Monell* Liability**

A government entity may be held liable under 42 U.S.C. section 1983 when "a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). To establish such liability, Plaintiff must show that: (1) she possessed a constitutional right of which she was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to her constitutional right; and (4) the policy is the moving force behind the constitutional violation. *Id.* (citing *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)). Plaintiff can show the existence of a policy in one of three ways: (1) by showing the entity acted "pursuant to an expressly adopted official policy"; (2) by showing the entity had a "longstanding practice or custom"; or (3) by showing an official with final policy-making authority ratified a subordinate's unconstitutional decision or action. *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973–74 (9th Cir. 2021) (citations omitted). Municipal liability is "contingent on a violation of constitutional rights." *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994).

**a. Fourth Amendment: Unreasonable Seizure of Person (Claim One)**

As set forth above, the Court has found triable issues of fact as to whether Lacoste's Fourth Amendment rights against excessive force and unlawful arrest were violated. Next, the Court assesses whether there is a genuine dispute of fact that there was a policy or custom sufficiently connected to the alleged constitutional violations.

In opposing Defendant's summary judgment motion, Lacoste contends that the County has a longstanding practice or custom of using excessive force and unlawfully

arresting people. DMSJ Opp. at 5. In support, she points to orders issued in *Berg v. Cnty. of Los Angeles* and *Astorga v. Cnty. of Los Angeles*, and to evidence that Defendants refuse to "investigate the complaints the entity defendants received over the years regarding the deputies' misconduct on September 8, 2020." *Id.* at 6. The Court reiterates that it cannot take judicial notice of other cases, "so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it." *See M/V Am. Queen*, 708 F.2d at 1491. The Court will refer only to the factual record presently before it to assess whether there is a genuine dispute of material fact. The Court may take judicial notice, however, of the existence of other orders and may look to the legal reasoning in those orders as persuasive authority.

**1) Excessive Force**

Based on the record before the Court, there are triable issues of fact as to whether the County has a longstanding practice or custom of using excessive force against nonviolent protesters. As the *Astorga* court did, this Court looks to Sergeant Bergner's September 8, 2020 Report, which was formally introduced as evidence in this case. In his report, Bergner noted that individuals in the crowd "started launching frozen water bottles and miscellaneous fireworks in the direction of SRT." Bergner Report at 3. In response, LASD deputies unleashed approximately 266 pepperballs, 21 40mm rounds, and 13 stingballs toward the "hostile crowd," even though "it [was] difficult to target individuals" given the formation of the crowd and the fact that the individuals who were launching objects were "immersed within the crowd." *Id.* In total, SRT "engaged the hostile crowd on five separate occasions" which led to the further deployment of at least 25 pepperballs, 15 40mm rounds, 18 stingball grenades, 2 blast balls, and 1 smoke grenade. *Id.* at 3–5. Drawing all inferences from the facts in favor of Lacoste, a reasonable jury could interpret these facts as indiscriminate firing into a crowd of people, some of whom, like Lacoste, were not engaged in hostile or violent behavior. Sergeant Bergner maintained that all "SRT members acted within department policy and displayed discipline when physically engaging with the crowd." *Id.* at 5. Sergeant Bergner's

affirmation of SRT's behavior as being "within department policy" could support an inference of the existence of an informal practice or custom of firing indiscriminately at protesters. A reasonable jury, viewing the evidence in light most favorable to Lacoste, may also conclude that this practice and custom, and Sergeant Bergner's validation of it, were the moving force behind the alleged constitutional violation.

Although the Court cannot take judicial notice of underlying facts, it can take judicial notice of the existence of filings. Relevant here is the existence of this Court's October 3, 2025 Order Re Plaintiffs' Motion to Find Defendants in Contempt for Violation of the Preliminary Injunction in *Berg*. *See Berg v. Cnty. of Los Angeles*, No. CV 20-7870-DMG (PDx), 2025 WL 2995075 (C.D. Cal. Oct. 3, 2025). The order granted the *Berg* plaintiffs' request to find the County of Los Angeles in contempt for violating its preliminary injunction order during protests that occurred in June 2025. *Id.* at *11. Specifically, this Court determined that there was clear and convincing evidence that LASD violated the preliminary injunction order by "firing less-lethal weapons indiscriminately" and "targeting non-threatening persons with less-lethal weapons." *Id.* at *8. The existence of the order finding the same Defendant County of Los Angeles in contempt for violating a preliminary injunction based on the same type of conduct complained of by Lacoste, raises triable issues of fact that the County has an informal custom or practice of deliberate indifference. *See Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("[P]ost-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry."). The fact that the incident involving Lacoste occurred approximately five years prior to the incidents giving rise to the contempt order in *Berg*, "not only adds weight to [her] claims, but also evidences that the policy was a long-standing one." *See id.* at 521.

Viewing all the evidence in the light most favorable to Lacoste, there are triable issues of fact as to whether the County had a practice or custom of using less-lethal force indiscriminately against protesters, in violation of the Fourth Amendment.

**2) Unlawful Arrest**

Plaintiff does not raise, however, triable issues of fact that the County had a policy, practice, or custom of unlawfully arresting protesters. First, Plaintiff points to no official policy. Second, to the extent Plaintiff alleged in her CSAC that her unlawful arrest was ratified by an official policy maker, she has not pointed to any admissible evidence in the record to support that theory here. Lastly, Plaintiff fails to raise a genuine issue of material fact as to whether the County had a longstanding practice or custom of unlawfully arresting protesters. Plaintiff's reference to *Astorga*, 2024 WL 3313747, is unhelpful to her. DMSJ Opp. at 5. There, the court granted the County summary judgment as to the Fourth Amendment unlawful arrest claim because the plaintiffs "do not point to any evidence supporting nor articulating a policy that operated as the moving force behind the arrests." *Astorga*, 2024 WL 3313747, at *11. Plaintiff's references to this Court's May 28, 2021 Order Re Plaintiffs' Motion for Preliminary Injunction and October 3, 2025 Contempt Order are equally unavailing. *See Berg v. Cnty. of Los Angeles*, No. CV 20-7870-DMG (PDx), 2021 WL 4691154 (C.D. Cal. 2021); *Berg*, 2025 WL 2995075. The Court did not discuss Fourth Amendment violations for unlawful arrests in either of its order.

Plaintiff argues that Defendants' refusal to "investigate the complaints the entity defendants received over the years regarding the deputies' misconduct on September 8, 2020" is evidence of *Monell* liability. *Id.* at 6. A custom or practice can be "inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011) (internal quotation marks and citation omitted). Plaintiff's sole evidence for her failure to investigate theory is a single paragraph in her counsel's declaration, which states: "Beginning in October 2020 and continuing up to mid-August 2023, my office or others complained to the County that deputies committed misconduct in arresting persons and using force against them in the

9/8/20 protest." Cook Decl. ISO DMSJ Opp. at ¶ 10.[24] The only specificity the declaration offers as to the nature and substance of the complaints is the filing of *Astorga* and *Lacoste*. *Id.* Such evidence is insufficient to raise a triable issue of fact that there were "widespread practices" constituting an informal policy of deliberate indifference.

Accordingly, the Court **GRANTS** Defendants' MSJ on Plaintiffs' Fourth Amendment unlawful arrest claim as to Defendants County of Los Angeles and LASD.

**b. Fourth Amendment: Unreasonable Seizure of Property (Claim Two)**

Defendants set forth evidence of written LASD policies pertaining to property and evidence procedures. *See* Defendants' Compendium of Exhibits ISO DMSJ, Ex. 6 ("LASD Property/Evidence Procedures") [Doc. # 123-2]. Plaintiff contends that the reasoning in *Astorga* applies with equal force here. In *Astorga*, the court determined that because LASD's policies did not articulate "a specific timeframe for when LASD officers ought to seek warrants" or a "specific timeline for release," "there appears to be a policy endorsing the delays [in returning property] which could confer *Monell* liability." *Astorga*, 2024 WL 3313747, at *8. The Court agrees.

The applicable species of *Monell* theory here is a theory of inaction or "official nonfeasance." "A policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012). To establish a policy of inaction, a plaintiff must show that the "policy amounts to deliberate indifference to the plaintiff's constitutional right" and that "the policy caused the violation, in the sense that the [municipality] could have prevented the violation with an appropriate policy." *Id.* (internal quotation marks

---

[24] Defendants object to this portion of Cook's Declaration under Federal Rule of Civil Procedure 56(c)(4). [Doc. # 133-1 at 80–81.] Rule 56(c)(4) provides "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). It appears Cook would have personal knowledge about the complaints his own law office made. The Court does not credit, however, what "others complained to the County" about given that the assertion is vague.

and citations omitted). "Deliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997)).

In the record before this Court, LASD's written policies surrounding property and evidence procedures do not specify a timeline for release of property. *See* LASD Property/Evidence Procedures. According to Defendants, it is "LASD policy that after its personnel have conducted an investigation and concluded that the property is no longer needed as evidence, that property shall be released to the legal owner provided doing so does not violate the law." Declaration of Jose N. Aguirre ("Aguirre Decl.") at ¶ 14 [Doc. # 123-2]. Furthermore, it is LASD policy that "any property no longer believed to be related to an ongoing criminal investigation be released to the owner." *Id.* at ¶ 7. LASD policy does not provide, however, any sort of timeline or outer limits on *when* personnel must conduct an investigation into whether the property is needed as evidence, nor any timeline or limits on *how soon after* the property is determined to be unrelated to a criminal investigation, it must be returned to the rightful owner. "Deliberate indifference" may exist where the need for additional or alternate action "is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Hyun Ju Park*, 952 F.3d at 1141 (quoting *City of Canton*, 489 U.S. at 390). Absent any timeframes, it remains a triable issue of fact whether LASD's policy is so inadequate that it is obviously likely to result in prolonged and unreasonable seizures of property. It is also a triable issue of fact whether the County/LASD could prevent such violations by adopting an appropriate policy.

Drawing all reasonable inferences in favor of Lacoste, a reasonable jury could conclude that the County had a policy of inaction amounting to deliberate indifference to Lacoste's constitutional right against unreasonable seizure of property.

//

**6. Fifth Amendment Takings Clause (Claim 3)**

Lacoste contends that the Entity Defendants violated the Fifth Amendment's Takings Clause by seizing her personal property without judicial review for six months. CSAC at ¶¶ 85–88. Defendants argue Lacoste's Taking Clause claim fails because the seizure and retention of her camera did not constitute a "taking" and was not seized for "public use." *See* DMSJ at 24–26.

The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, prohibits the government from taking private property for public use without just compensation. U.S. Const. amend. V, XI. The Takings Clause does not prohibit the taking of private property *per se*, "but instead places a condition on the exercise of that power." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005) (internal quotation marks omitted). The Takings Clause "is implicated only when the taking in question is for a public use." *Scott v. Jackson Cnty.*, 297 Fed. App'x 623, 625–26 (9th Cir. 2008). It is well-established that "[p]roperty seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause." *Amerisource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008), *cert. denied*, 556 U.S. 1126 (2009); *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331 (Fed. Cir. 2006). This rule applies even where the "property is seized as evidence in a criminal investigation . . . but is ultimately returned to the owner[.]" *Acadia Tech*, 458 F.3d at 1331–32. Here, it is undisputed that Defendants seized Lacoste's property after she was placed under arrest.

Plaintiff argues that because "defendants seized her property in violation of the Fourth Amendment, she has shown a Takings for which she is entitled to compensation." DMSJ Opp. at 5. Courts within the Ninth Circuit have held, however, that property seized pursuant to police power is not considered a taking for public use, "even if the plaintiff alleges that the exercise of police power was illegitimate or unlawful." *Missud v. California*, No. C-12-5468 EMC, 2013 WL 450391, at *4 (N.D. Cal. Feb. 5, 2013), *aff'd*, 538 Fed. App'x 809 (9th Cir. 2013) ("Towing cars that have accumulated an

excessive number of parking tickets is an exercise of police power, and not a taking for public purposes within the meaning of the Takings Clause."); *see also McLain v. City and Cnty. of San Francisco*, No. C 12-3225 MEJ, 2014 WL 465595 at *12 (N.D. Cal. Feb. 3, 2014) (towing of plaintiff's boat pursuant to vehicle code section was not a taking for public use even though plaintiff challenged the seizure for lack of probable cause); *Deligiannis v. City of Anaheim*, SACV 06-720 DOC (JCx), 2010 WL 1444538, at *8 (C.D. Cal. Mar. 2, 2010), *report and recommendation adopted*, SACV 06-720 DOC (JCx), 2010 WL 1444535 (C.D. Cal. Apr. 3, 2010), *aff'd*, 471 F. App'x 603 (9th Cir. 2012) ("[W]hile the propriety of the exercise of the police's authority to seize plaintiff's vehicle remains in issue, the record reflects that such vehicle was seized by the police pursuant to its police power" and therefore was not taken for public use). In other words, the "unlawful seizure of property does not constitute a 'public use.'" *Mateos-Sandoval v. Cnty. of Sonoma*, 942 F. Supp. 2d 890, 912 (N.D. Cal. 2013) (concluding that even if plaintiffs could prove a Fourth Amendment violation for unlawful seizure of their property, "that does not mean that the taking was 'for public use.'"). In the absence of binding authority suggesting otherwise, the Court concludes that Plaintiff's Takings Clause claim fails as a matter of law.

Accordingly, the Court **GRANTS** Defendants' MSJ as to Plaintiff's Fifth Amendment Takings Clause claim as to Defendants County of Los Angeles and LASD.

**7. Privacy Protection Act of 1980 (Claim 5)**

Plaintiff asserts that the Entity Defendants violated the Privacy Protection Act of 1980 ("PPA") when they seized her camera containing work product intended to be disseminated to the public. CSAC at ¶¶ 92–96. The PPA prohibits law enforcement from searching for or seizing "any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication." 42 U.S.C. § 2000aa(a). The PPA provides a civil right of action against any "governmental unit" that "shall be liable for violations of this chapter by their officers or employees while acting within the scope

or under color of their office or employment." 42 U.S.C. § 2000aa-6(a)(1). The PPA contains an exception, however, for the search or seizure of such materials if "there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate." 42 U.S.C. § 2000aa(a)(1). This exception is commonly known as the "suspect exception." *Am. News and Info. Servs., Inc. v. Gore*, 778 Fed. App'x 429, 431 (9th Cir. 2019); *see also United States v. Mittelman*, 999 F.2d 440, 443 (9th Cir. 1993) (the PPA "does not apply to criminal suspects").

First, Defendants argue that because Lacoste's CSAC alleged the Entity Defendants were "acting ***without*** the course and scope of their employment," CSAC at ¶ 96, she is foreclosed from raising a PPA claim because the PPA requires that the violation be committed by an officer or employee "acting ***within*** the scope or under color of his office or employment." *See* 42 U.S.C. § 2000aa-6(a)(1); DMSJ at 28–29. It appears clear to the Court that Plaintiff's CSAC stating Defendants were "acting without the course and scope of their employment" is a typographical error. Defendants point to no authority suggesting that a misstatement in a pleading supplies grounds for granting summary judgment. To the contrary, when a party explains an error appearing in a pleading, "the trial court must accord the explanation due weight." *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859–60 (9th Cir. 1995). Since there is sufficient evidence in the record that Defendants were acting within the scope of their employment when they seized Lacoste's camera, the Court will not grant summary judgment based on a typographical error in a pleading.

Second, Defendants contend that the PPA suspect exception applies because probable cause existed to arrest Lacoste for failing to disperse under Penal Code section 409, and the seized materials (i.e., images on her camera) were related to that offense. DMSJ at 29. As discussed above, the Court has already determined that there are triable issues of fact as to whether probable cause existed for Lacoste's arrest. Since there are

genuine disputes of material fact about the existence of probable cause, summary judgment is inappropriate as to whether the suspect exception of the PPA applies.

Accordingly, the Court **DENIES** Defendants' MSJ as to Plaintiff's PPA claim.

**C. Plaintiff's MSJ**

Plaintiff moves for partial summary judgment on her Fourth Amendment claims. Specifically, Plaintiff asks the Court to find that her Fourth Amendment rights were violated as a matter of law when she was arrested, shot, and detained for a prolonged period, and when her camera was seized for a prolonged period. PMSJ at 6. Lacoste asks for the Court to "summarily adjudicate" this issue, without "a liability finding against any particular defendant for the established Fourth Amendment violations." *Id.*; *see also* Doc. # 110-21 (proposed order granting PMSJ). Lacoste points to the language of Federal Rule of Civil Procedure 56(a) and (g) to support her request. Rule 56(a) provides, "A party may move for summary judgment, identifying each claim or defense—or part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Rule 56(g) provides, "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

Plaintiff cites one district court order, *Patricia Frazier, et al. v. City of Los Angeles, et. al.*, No. CV 07-3502 RGK (CWx) (C.D. Cal. 2008), where the court granted the plaintiff's motion for summary adjudication that her Fourth Amendment rights were violated, without ruling on any particular defendant's liability under Section 1983. [Doc. # 116, Ex. A ("*Frazier* Order").] Notably, in *Frazier*, the court analyzed and assessed whether the individual defendants were entitled to qualified immunity and whether the government was liable under *Monell*. In other words, the court did not assess the Fourth Amendment violation in a complete vacuum as to who could be liable, as Plaintiff requests here. Plaintiff provides no authority—and this Court is unaware of any—allowing a court to adjudicate a motion for summary judgment in a Section 1983 action

with no analysis or discussion of potential liability as to specific defendants. This is somewhat of a moot point, however, given that the Court conducted an analysis of each Defendant's potential liability in ruling on Defendants' MSJ above.

Based on the Court's rulings on Defendants' MSJ, the only Fourth Amendment claims remaining are the unlawful arrest claim against Defendant Muller, the excessive force claim against Defendants Bergner and the County, and the unreasonable seizure of property claim against the County. In support of her MSJ, Lacoste points to no evidence not already considered in the analysis of Defendants' MSJ. When viewing the evidence in the light most favorable to Defendants, there are triable issues of material fact as to these remaining claims. Specifically, with regard to the unlawful arrest claim, there are triable issues of fact as to the time of Lacoste's arrest and whether her presence about 1,000 feet from the intersection of 110th St. and Normandie Ave. (where the last use of force was "needed") was "remaining present at the place of" an unlawful assembly. As for the excessive force claim, none of the SRT deputies reported deploying less lethal munitions around 1234 W. 110th St., and Sergeant Bergner claims that the last use of force occurred at the intersection of Normandie Ave. and 110th St. Lacoste did not see anyone taking aim at her before she was struck. The parties dispute whether the injuries Lacoste sustained were caused by less lethal munitions. Accordingly, viewing the evidence in the light most favorable to Defendants, there are triable issues as to the use of excessive force. Lastly, as to the unreasonable seizure of property claim, a jury must weigh the credibility of Defendants' claimed justification for retaining the camera for investigative value against the length of the retention and the intrusion on Lacoste's property interests.

The Court cannot find that there are no genuine disputes of material fact such that it can conclude Plaintiff's Fourth Amendment rights were violated as a matter of law. As such, the Court **DENIES** Plaintiff's MSJ.

//

//

**D. Defendant LASD is Duplicative of Defendant County**

Lacoste has not presented any facts that distinguish the conduct of the LASD from the County. The Court therefore finds that the claims against the LASD are duplicative of those against the County. *See Smith v. Cnty. of Orange*, 678 F. Supp. 3d 1182, 1214–15 (C.D. Cal. 2023) (granting summary judgment in favor of sheriff's department where claims against the county and sheriff's department were redundant). Lacoste can obtain full relief from the County on her remaining claims even in the absence of the LASD as a party. Accordingly, the Court **DISMISSES** the LASD **without prejudice** as a Defendant in this action as to Plaintiff's first (Fourth Amendment excessive force), second (Fourth Amendment deprivation of property), and fifth (Privacy Protection Act) causes of action.

**V.**

**CONCLUSION**

In light of the foregoing, the Court issues the following orders:

1. Plaintiff's Motion for Sanctions due to spoliation of evidence is **DENIED**.
2. Defendants' MSJ is **GRANTED in part and DENIED in part** as follows:
    a. Defendants' MSJ is **GRANTED** as to Plaintiff's Fourth Amendment unlawful arrest claim under 42 U.S.C. section 1983 against Defendants Deboom, Escobedo, Hurtado, Ramirez, Zagurski, Okamoto, Ruiz, Munoz, Meza, Do, McDaniel, Bergner, Villanueva, the County, and LASD. Defendants' MSJ is **DENIED** as to Plaintiff's Fourth Amendment unlawful arrest claim under 42 U.S.C. section 1983 against Defendant Muller.
    b. Defendants' MSJ is **GRANTED** as to Plaintiff's Fourth Amendment excessive force claim under 42 U.S.C. section 1983 against Defendants Deboom, Escobedo, Hurtado, Ramirez, Zagurski, Okamoto, Ruiz, Munoz, Meza, Do, McDaniel, Muller, and Villanueva. Defendants' MSJ is **DENIED** as to Plaintiff's Fourth Amendment excessive force claim

under 42 U.S.C. section 1983 against Defendants Bergner and the County.

c. Defendants' MSJ is **GRANTED** insofar as Plaintiff alleges a claim for violation of her Fourth Amendment rights against prolonged detention under 42 U.S.C. section 1983 against all Defendants.

d. Defendants' MSJ is **GRANTED** as to Plaintiff's Fourth Amendment deprivation of property claim under 42 U.S.C. section 1983 against Defendants McDaniel, Muller, Bergner, DeBoom, Escobedo, Hurtado, Ramirez, Zagurski, Okamoto, Ruiz, Meza, Munoz, Do, and Villanueva. Defendants' MSJ is **DENIED** as to Plaintiff's Fourth Amendment deprivation of property claim under 42 U.S.C. section 1983 against Defendant the County.

e. Defendants' MSJ is **GRANTED** as to Plaintiff's Fifth Amendment Takings Clause claim under 42 U.S.C. section 1983 against Defendant the County and LASD.

f. Defendants' MSJ is **GRANTED** insofar as Plaintiff alleges a claim for violation of her First Amendment rights to freedom of speech, assembly, and association under 42 U.S.C. section 1983 against all Defendants.

g. Defendants' MSJ is **DENIED** as to Plaintiff's Privacy Protection Act of 1980, 42 U.S.C. section 2000aa, claim under 42 U.S.C. section 1983 against Defendant the County.

3. Plaintiffs' MSJ is **DENIED**.
4. The claims remaining for trial are the following:

a. 42 U.S.C. section 1983 claim for violation of the Fourth Amendment for unlawful arrest against Defendant Muller;

b. 42 U.S.C. section 1983 claim for violation of the Fourth Amendment for excessive force against Defendants Bergner and the County;

c. 42 U.S.C. section 1983 claim for violation of the Fourth Amendment and Fourteenth Amendment for deprivation of property against Defendant the County; and

d. 42 U.S.C. section 1983 claim for violation of the Privacy Protection Act of 1980, 42 U.S.C. section 2000aa against Defendant the County.

**IT IS SO ORDERED.**

DATED: August 10, 2026

DOLLY M. GEE
CHIEF UNITED STATES DISTRICT JUDGE